In re Anthony R. MARTIN–TRIGONA.

Anthony R. MARTIN–TRIGONA

v.

Harold LAVIEN et al.

Anthony R. MARTIN–TRIGONA

v.

William French SMITH et al.

Misc. Civ. No. H 83–62.

Civ. Nos. H 83–305, H 83–322.

United States District Court,
D. Connecticut.

Sept. 26, 1983.

---

Anthony R. Martin-Trigona, pro se.

W. Philip Jones, Department of Justice, Washington, D.C., for Federal defendants (Judge Harold Lavien, Judge Robert L. Krechevsky, Judge Alan H.W. Shiff and U.S. Attorney Alan H. Nevas).

Laura L. Carroll, Goodwin, Procter & Hoar, Boston, Mass., for defendant Jon D. Schneider.

Richard Coan, Coan, Lewendon & Royston, New Haven, Conn., for Richard Belford, Trustee in Bankruptcy of Estate of Anthony R. Martin-Trigona.

Irving H. Perlmutter, Ullman, Perlmutter & Sklaver, New Haven, Conn., for Daniel Meister, Trustee in Bankruptcy of New Haven Radio, Inc.

Francis J. Wynne, Hartford, Conn., for Robert K. Killian.

Elliot B. Pasik, D'Amato & Lynch, New York City, for defendants Belford, Coan and Meister.

## MEMORANDUM OF DECISION

JOSÉ A. CABRANES, District Judge:

On June 17, 1983, this court entered an order of permanent injunction imposing severe limitations upon the freedom of Anthony R. Martin-Trigona to commence new litigation and to institute appeals from presently pending bankruptcy proceedings in which he claims an interest. The order of permanent injunction entered on June 17, 1983 was read in open court at a hearing attended by Martin-Trigona[1] and copies of the order were delivered in hand to all persons present at the hearing, including Martin-Trigona.[2] The order of June 17 was replaced on June 23, 1983 by the substantially identical Order of Permanent Injunction (the "Order"), *See* Appendix C, *infra*, at 1261;[3] the Order has remained in full force and effect since June 23, 1983.

Because of the unusual sweep of the Order, and because of the even more unusual circumstances giving rise to it, the court now enters this memorandum setting forth the factual and legal context within which the Order issued.[4] Some delay between issuance of the Order and entry of

1. *See* Certified Official Transcript of Hearing of June 17, 1983 (filed July 1, 1983) ("Tr. (June 17)") at 109–130.

2. *Id.* at 130.

3. *See* Certified Official Transcript of Hearing of June 23, 1983 (filed July 18, 1983) ("Tr. (June 23)") at 83–86. The Order was also served in open court on all persons present at the hearing of June 23, including Martin-Trigona. *Id.* The court on June 17, 1983 had also read from the bench the substance of its ruling on Martin-Trigona's motion to recuse, Tr. (June 17) at 38, 155–161, and *id.* at 23–38 (oral argument on motion to recuse); the written version of the ruling on the motion to recuse, which had been served on all present, including Martin-Trigona, at the June 17 hearing, *id.* at 161–162, was subsequently edited and a final version of that ruling was entered in typescript form on July 1, 1983 and published at 573 F.Supp. 1237 (D.Conn.

1983). A supplemental order of injunction read from the bench on June 17, 1983, Tr. (June 17) at 130–133, regarding certain threats by Martin-Trigona to convey documents and other materials to the homes of judicial officers and court officials, for the apparent purpose of harassing or intimidating them, *see, e.g.,* Letter from Anthony R. Martin-Trigona to John K. Henderson, Deputy-in-Charge, Office of the Clerk, Hartford and to me (Court Exhibit 7, Hearing of June 28, 1983), was entered in typescript form on June 20, 1983. This supplemental order of injunction and the order of permanent injunction entered on June 17, 1983 were both superseded by the Order when the latter was entered on June 23, 1983. Tr. (June 23) at 84; *see* Appendix C, *infra*, at 1261, 1268.

4. The Order itself included extensive findings of fact and conclusions of law, *see* Appendix C, *infra*, which are supplemented by this memorandum of decision. Rule 52(a), Fed.R.Civ.P.

this memorandum has been occasioned by the necessity of waiting for the preparation of transcripts of the pertinent hearings.

## I.

In the annals of American *pro se* litigants, Anthony R. Martin-Trigona is quite special, if not unique. He may not be the most prolific such litigant in our legal history: the Court of Appeals for the District of Columbia Circuit has already awarded that dubious laurel to the Rev. Clovis Carl Green, said to have filed between 600 and 700 complaints. *See In Re Green*, 669 F.2d 779, 781 (D.C.Cir.1981) (per curiam). A survey prepared for this court suggests that Martin-Trigona has filed at least 250 suits, though that is probably a conservative figure. *See* Order, Appendix C, *infra*, Appendices I and II. If Martin-Trigona has not set the record for sheer quantity, however, he has distinguished himself by the style of litigation he has adopted and by the cunning and malignant sophistication he has brought to his avocation.

The contours of his career at the bar can be traced by reference to two of his cases. In 1970, having graduated from the University of Illinois College of Law, Martin-Trigona sat for and passed the Illinois Bar examination. On the basis of the record before it, the Committee on Character and Fitness required Martin-Trigona to undergo a psychiatric examination.[5] When he refused to do so, the Committee voted against recommending his admission to the bar. Reviewing the Committee's refusal to certify Martin-Trigona, the Supreme Court of Illinois noted that Martin-Trigona's "propensity to unreasonably react against anyone whom he believes opposes him reveals his lack of responsibility...." *In re Martin-Trigona*, 55 Ill.2d 301, 302 N.E.2d 68, 72 (1973), *cert. denied*, 417 U.S. 909, 94

S.Ct. 2605, 41 L.Ed.2d 212 (1974). That court noted that Martin-Trigona's dealings with the Committee had been marked by abusive, personally derogatory charges leveled against Committee members by Martin-Trigona in language often vulgar and profane. That court also mentioned two unrelated cases in which Martin-Trigona, proceeding *pro se*, had accused judges before whom he appeared of insanity and sought their recusal because he had named them as defendants in other actions.

Denying Martin-Trigona's application for admission to the bar, the court wrote: "While it is not challenged that he may possess the requisite academic qualifications to practice law, the record overwhelmingly establishes that he lacks the qualities of responsibility, candor, fairness, self-restraint, objectivity and respect for the judicial system which are necessary adjuncts to the orderly administration of justice." *Id.*, 302 N.E.2d at 74.

Martin-Trigona was not content to let the matter rest there: after the Supreme Court of the United States refused to review the Illinois decision, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974), Martin-Trigona launched several federal suits against the members of the Illinois Supreme Court and the Committee on Character and Fitness. *See Martin-Trigona v. Underwood*, 529 F.2d 33 (7th Cir.1975) (per curiam).

Failure to gain admission to the bar did not mean that Martin-Trigona became a stranger to the nation's courtrooms. On the contrary, he has engaged in litigation with zeal, energy and passion that would be the envy of any attorney, and his practice has been as variegated as that of any law firm in the country, including communications, bankruptcy, contract, environmental, Selective Service, prisoner's rights,

---

5. The Committee apparently requested that Martin-Trigona undergo a psychiatric examination on the basis of a record that included, *inter alia*, Martin-Trigona's Selective Service records; these records "included a psychiatric evaluation to the effect that [Martin-Trigona] was 'unacceptable for induction because of a moderately-severe character defect manifested by well documented ideation with a paranoid flavor and

grandiose character.'" *Martin-Trigona v. Underwood*, 529 F.2d 33, 34 (7th Cir.1975) (per curiam) (finding that the procedures which resulted in the denial of Martin-Trigona's application for admission to the Illinois Bar were not tainted by any unconstitutional infirmities and that the denial of admission was not grounded on any constitutionally impermissible reasons).

antitrust, civil rights, housing discrimination, Freedom of Information Act, transportation, and banking cases, among many others.

Throughout Martin-Trigona's career, however, there has persisted the same ugly strand of personal animus and unjustifiable vituperation that the Illinois Supreme Court observed in 1973. Nearly a decade after that court's denial of his application for admission to the bar, another court took "judicial notice that Martin-Trigona has over the years filed a substantial number of lawsuits of a vexatious, frivolous and scandalous nature." Judge Weinfeld went on to say of Martin-Trigona:

> He has been a persistent and calculating litigator. There is a long trail of such actions commenced by him against federal and state judges, bar examiners, public officials, public agencies, lawyers and individuals who in one way or another had any relationship, directly or indirectly, to any matter concerning him.

*Martin-Trigona v. Brooks & Holtzman,* 551 F.Supp. 1378, 1384 (S.D.N.Y.1982). Judge Weinfeld also quoted the words of the Court of Appeals, which observed in another case that Martin-Trigona tended "to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him," *Martin-Trigona v. Gouletas,* 634 F.2d 354, 362 (7th Cir.), *cert. denied,* 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980). As our own Court of Appeals has tersely observed, "Martin-Trigona is not your typical *pro se* advocate," *Martin-Trigona v. Shiff,* 702 F.2d 380, 382 n. 1 (2d Cir.1983).

*Brooks & Holtzman, supra,* gives the flavor of Martin-Trigona's atypical advocacy. Martin-Trigona had filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York and that proceeding had been transferred to the District of Connecticut, the site of a major

asset in which Martin-Trigona claims an interest, New Haven Radio, Inc. ("New Haven Radio"), which is also in bankruptcy. In the New York federal bankruptcy action, Martin-Trigona had appealed to the district court the order of transfer, and a Connecticut attorney, representing the trustee appointed by the bankruptcy judge in Connecticut, had been granted leave to appear *pro hac vice* in order to intervene and oppose Martin-Trigona's appeal. Characteristically, Martin-Trigona filed a complaint against the Connecticut attorney before the state bar grievance committee and sued him many times in several federal and state courts, in three district courts and in two circuits (in, among other cases, Civ. No. H 83–305 in this court). In *Brooks & Holtzman,* however, Martin-Trigona sued the New York attorney who had merely moved the court to grant the Connecticut attorney leave to appear. The basis of that suit seems to have been an allegation that the New York attorney had somehow lied in his description of the Connecticut attorney's role in the litigation. The suit was, needless to say, frivolous.

But Martin-Trigona did not even stop at anything as uncomplicated as a vexatious and vindictive suit. He also filed a complaint with the Disciplinary Committee of the New York State Supreme Court and sought to attach property of the defendant New York attorney and his law firm. After reviewing Martin-Trigona's machinations, Judge Weinfeld granted summary judgment for the defendants, the New York attorney and his firm, and enjoined Martin-Trigona "from instituting any other actions in proceedings against them, whatever kind or nature, based upon their motion to admit [the Connecticut attorney] to appear *pro hac vice* in this Court in the debtor proceedings referred to herein[,]" *Martin-Trigona v. Brooks & Holtzman, supra,* 551 F.Supp. at 1385.[6]

---

**6.** Judge Weinfeld explained how "[a] common courtesy by Daniel J. Brooks, an attorney admitted to practice in [the United States District Court for the Southern District of New York] ... triggered [that] action":

Coan [the Connecticut lawyer appointed as counsel by the Bankruptcy court in Connecticut to represent the trustee of the Martin-Trigona estate] ... requested Brooks, a friend and law school classmate, to move Coan's

Suing attorneys who oppose him has been a favored device of Martin-Trigona's for some time, both in the bankruptcy litigation at issue in New York and Connecticut and in other cases, such as, *e.g., Martin-Trigona v. Bloomington Federal Savings & Loan Association*, 101 Ill.App.3d 943, 57 Ill.Dec. 348, 428 N.E.2d 1028 (1st Dist.1981). Judge Weinfeld has pointed out the cruel effectiveness of that device, which subjects attorneys to the necessity of defending themselves and enduring often outrageous accusations (of insanity, unethical conduct, and criminal activity, to summarize the usual allegations). *See Martin-Trigona v. Brooks & Holtzman, supra*, 551 F.Supp. at 1384.[7]

## II.

When Martin-Trigona's personal bankruptcy case was transferred to Connecticut, it was consolidated for administrative purposes with the New Haven Radio bankruptcy, and proceedings in the two matters went forward before, first, Judge Shiff of the United States Bankruptcy Court for the District of Connecticut and, later, Judge Krechevsky of the same court. During the pendency of those proceedings, Martin-Trigona regularly filed numerous interlocutory appeals from orders of the bankruptcy court and sought to commence related actions in this court. Under this court's regular practice, each of the proceedings or cases was assigned on a random basis to one or another district judge. Virtually without exception the suits Martin-Trigona sought to maintain before the district court, whether under its original or its appellate jurisdiction, were dismissed as frivolous or otherwise summarily disposed of.

As the pace of Martin-Trigona's filings quickened, the judges of the district court determined that efficient administration of the litigation involving Martin-Trigona could best be achieved by assignment of all cases involving him to a single district judge. Accordingly, all pending cases were transferred to me.[8] The burden imposed

admission *pro hac vice*. Brooks agreed to do so and both he and Coan co-signed a joint motion to this Court for leave for Coan to appear *pro hac vice* on behalf of the trustee to oppose Martin-Trigona's appeal [of the New York bankruptcy court's order to transfer the New York bankruptcy case to Connecticut].

Following receipt of the notice of that motion, Martin-Trigona, by letter dated June 24, 1982, ... cautioned Brooks that unless he withdrew his appearance a professional disciplinary proceeding and legal action would follow, as indeed they did. In fact, Martin-Trigona commenced this action [against Brooks and his law firm] in the Supreme Court of the State of New York on June 24, 1982, *even before the return date of the motion for leave to appear pro hac vice,* which was returnable June 29, 1982, the same day when the appeal ... was scheduled. On [June 29, 1982], after hearing the respective parties, this Court, over Martin-Trigona's objection, granted the motion to admit Coan *pro hac vice....* On July 14, 1982, Brooks and his law firm removed Martin-Trigona's action from the Supreme Court of the State of New York to this court....

*Martin-Trigona v. Brooks & Holtzman*, 551 F.Supp. 1378, 1380–1381 (S.D.N.Y.1982) (emphasis added).

7. For a more detailed description of Martin-Trigona's *modus operandi* as a litigant, *see* Appendix A, *infra* at 1256–1258.

8. In fact, Martin-Trigona himself apparently could not keep up the frantic pace he had set for himself and all others in the federal court system of Connecticut, for it was he who requested that pending bankruptcy appeals and related cases be transferred from the dockets of other judges of the district court to me. *See* Request for Transfer of Pending Bankruptcy Appeals and Related Civil Cases to Judge Cabranes (dated Oct. 27, 1982) (Court Exhibit 1, Hearing of June 20, 1983 in Misc.Civ. No. H 83–62), addressed by Martin-Trigona to Judges Daly, Eginton and Burns. *See also* Certified Official Transcript of Hearing of January 12, 1983 (filed Aug. 29, 1983) at 16–18, 23–25, 49–52, 70–71 (court expresses concern that "the line between one case or another ... is very ill-defined," that "we have an enormous number of pleadings or pieces of paper floating about ... an avalanche of paper largely from Mr. Martin-Trigona," and that there is a need for "an orderly process"; parties agree that consolidation and transfer to Judge Cabranes would serve the interests of judicial economy and the interests of justice). For a sense of the general confusion created in this District alone, *see, e.g., id.* at 34–44, 49–51, 60–66. In January 1982, after "thank[ing] the court for trying to pull these horses together and put a leash on it and get it in some form," *id.* at 69, Martin-Trigona noted that as of January 1982 he had "at least two dozen appeals, maybe more," pending in the Court of Appeals for the Second Circuit. *Id.* at 70.

upon the Clerk's Office by the multiplying papers and the incessant closing and re-opening of cases by Martin-Trigona necessitated additional administrative innovations. Shortly after the filing of *Martin-Trigona v. Lavien,* Civ. No. H 83–305, and *Martin-Trigona v. Smith,* Civ. No. H 83–322, this court ordered that no new files be opened and established Misc.Civ. No. H 83–62 as a file to embrace (at least for pretrial purposes) all Martin-Trigona civil actions in the District—a catch-all for new actions purportedly commenced by Martin-Trigona *and* for the filing of papers pertaining to all pending litigation involving him.[9]

I first became acquainted with Martin-Trigona when four cases filed by Martin-Trigona in this court were assigned to me in the normal course—*In re Martin-Trigona,* Civ. No. H 82–694; *In re New Haven Radio, Inc.,* Civ. No. H 82–695; *In re New Haven Radio, Inc.,* Civ. No. H 82–708; and *In re Martin-Trigona,* Civ. No. H 82–709. Since then numerous hearings on matters involving Martin-Trigona have been held before me. Some of those hearings involved the civil matters already identified. Others concerned two related sets of litigation. First, there were outstanding motions by Martin-Trigona's adversaries to incarcerate him as a civil contemnor for having failed to answer questions put to him during the course of a proceeding under Rule 205 of the Rules of Bankruptcy Procedure. That motion had been the underlying subject of the Court of Appeals' decision in *Martin-Trigona v. Shiff, supra.* Second, there was a certification of criminal contempt by Judge Krechevsky. The Emergency Resolution for Administration of Bankruptcy System (filed Dec. 22, 1982), adopted by the judges of the district court provides that, upon a certification of criminal contempt, the matter in question is transferred for trial from the Bankruptcy Court to a district judge. Although both the civil and criminal contempts were alleged to have arisen out of Martin-Trigona's conduct during the bankruptcy proceedings, administration of the contempt proceedings was separated from administration of other matters involving Martin-Trigona in this court.

In an order of May 6, 1983, the court scheduled a hearing for June 6, 1983 on all pending motions in Misc.Civ. No. H 83–62, including a motion to incarcerate Martin-Trigona as a contemnor.[10] Defendants in Civ. No. H 83–305 moved on June 2, 1983 to strike portions of the complaint in that case and to enjoin Martin-Trigona from filing further lawsuits; before and after that date defendants in Civ. No. H 83–322 and in several other cases that now are consolidated in Misc.Civ. No. H 83–62 also moved to dismiss the actions against them.[11] On

---

Acting at the behest of Martin-Trigona (and with the consent of other judges) and in the interest of the effective administration of the system of justice, Chief Judge Daly ordered that matters relating to Anthony R. Martin-Trigona and New Haven Radio be assigned for all purposes to me; at or about that time the various district judges transferred the Martin-Trigona matters on their dockets to me. *See, e.g.,* Order of Chief Judge T.F. Gilroy Daly (filed Jan. 11, 1983) ("In the interest of justice and with the consent of Judge Cabranes, the above-captioned matters [Civ. Nos. B 82–366, N 80–172, N 82–158, B 82–57, B 82–62, B 82–63, B 82–64, B 82–68 and Misc. Civ. No. N.H. 478] are hereby transferred to the docket of Judge José A. Cabranes, United States District Judge."); Order of Chief Judge T.F. Gilroy Daly (filed Jan. 31, 1983) in Misc. B 82–56; Order of Transfer of Judge Ellen Bree Burns (filed March 2, 1983) in Misc. Civ. No. B 82–8, Civ. Nos. B 82–140, B 82–152 and B 82–163; Order of Chief Judge T.F. Gilroy Daly (filed

March 25, 1983) in *Martin-Trigona v. Shiff,* Civ. No. B 82–89, after remand by the Court of Appeals. 702 F.2d 380 (2d Cir.1983).

**9.** A further discussion of these efforts by the court, together with the initial response of Martin-Trigona, appears in Appendix B, *infra.*

**10.** *See* Order (filed May 6, 1983) in Misc.Civ. H 83–62; *see, e.g.,* Motion to Take Contemnor Into Custody (filed March 27, 1983), following the remand by the Court of Appeals in *Martin-Trigona v. Shiff, supra* note 8.

**11.** *See* Federal Defendants' Motion to Strike, Dismiss, and For Injunctive Relief (filed June 2, 1983); *see also, e.g.,* Thomas V. Urmy, Jr.'s Motion to Dismiss Complaint in Civ. Nos. H 83–305 and H 83–62 (filed May 13, 1983); Motion of Defendant Jon D. Schneider to Dismiss Plaintiff's Complaint in Civ. Nos. H 83–305 and H 83–62 (filed May 12, 1983).

June 3, 1983, during a hearing on the separate criminal contempt matter, the court specifically reminded Martin-Trigona of the June 6, 1983 hearing date and matters that would be treated at that hearing.[12]

Despite the court's efforts to ensure his presence, Martin-Trigona failed to appear on June 6, 1983.[13] The court did not at that time dismiss any of Martin-Trigona's pending actions, as it arguably could have done,[14] but it did enter a temporary restraining order,[15] under the terms of which Martin-Trigona was barred for ten days from filing any new cases in the District of Connecticut. By order to show cause, the court then set a new hearing date of June 16, 1983 for the pending motions filed by defendants, and at which Martin-Trigona was directed to show cause why, *inter alia*, "the [nationwide] injunction sought by the Government should not issue." [16]

Martin-Trigona used the intervening week-and-a-half to commence what purported to be a new lawsuit against my wife and me and others in the Supreme Court of the State of New York. He also unveiled a new web of allegations about asserted improprieties committed by the court and various attorneys having only the most tangential connection with Martin-Trigona. True to his fashion, Martin-Trigona sought to ensure publication of those allegations in the local press and accompanied his new lawsuit with an array of demands, notices, and other papers, many of which he served on persons who had until that time barely heard of his existence. Finally, he filed a motion to recuse, arguing *inter alia* that, as a defendant in an action brought by him, the court could not properly entertain the cases before it.[17]

12. *See, e.g.,* Certified Official Transcript of Hearing of June 3, 1983 (filed June 8, 1983) ("Tr. (June 3)") at 23, 27, 31, 64–76, 80, 82. The court, in its order of May 6, 1983 in Misc. Civ. No. H 83–62, had scheduled a hearing on all pending motions, including the motion for immediate incarceration of Martin-Trigona as a contemnor, *see* note 10 *supra,* and the Clerk's Office had issued a calendar that also gave Martin-Trigona actual notice of the June 6, 1983 hearing—the hearing to which repeated references are made on the record of the hearing of June 3, 1983, in colloquies with Martin-Trigona and various counsel. *See also* Tr. (June 6) at 13–16, 21–28.

13. *See* Tr. (June 16) at 13 and *passim; see* note 12, *supra; see also* Tr. (June 6) at 13–16, 21–28. The May 6, 1983 order under which the June 6, 1983 hearing was scheduled clearly indicated that at that hearing the court would consider, *inter alia,* the motion to incarcerate Martin-Trigona as a contemnor (or otherwise pursue the inquiries which had led Judge Shiff to hold him in civil contempt in the first place, *see Martin-Trigona v. Shiff, supra* ). Under the circumstances, it cannot be doubted that the various orders of the court (including the court's calendar) and the colloquies in open court of June 3, 1983 apprised Martin-Trigona of the court's expectations that he would be present at the June 6, 1983 hearing as well as the purposes of that hearing.

14. *See, e.g.,* Tr. (June 6) at 22, 28, 30; the court on June 6 did grant the motion to take Martin-Trigona into custody, *see* notes 10, 12 and 13, *supra,* but in effect only for the limited purpose of assuring his presence for a continuation of the examination that earlier had resulted in a finding of civil contempt. *See Martin-Trigona v. Shiff, supra; see, e.g.,* Tr. (June 6) at 22, 36–37, 43–53, 55–57, 59–60, 61–63.

15. Temporary Restraining Order (granted in open court on June 6, 1983, *see* Tr. (June 6) at 81–83, entered in written form on June 8, 1983). *See* notes 10, 12, 13 and 14, *supra,* and accompanying text. In addition, papers prepared and filed by Martin-Trigona at or about the time of the hearings of July 3 and July 6 confirm the fact that he had actual notice of the June 6, 1983 hearing but elected, for fanciful reasons, not to attend. *See, e.g.,* Letter of Anthony R. Martin-Trigona to José A. Cabranes (dated June 4, 1983) (Court Exhibit 9a, Hearing of June 28, 1983), *written two days before the June 6, 1983 hearing* and captioned "Statement Concerning Hearing of June 6, 1983," in which Martin-Trigona, *inter alia,* states that the June 6, 1983 hearing "you have set is a waste of time," that "it would in any event be a waste of time for me to appear" (p. 3) and that "[the court's] desire to extort my presence in Connecticut is unseemly and will in the end only embarrass you" (p. 4).

16. Order to Show Cause (filed June 8, 1983); *see also* Tr. (June 6) at 67–77 (colloquy with counsel on the projected terms of the order to show cause).

17. *Martin-Trigona v. Cabranes et al.* (Supreme Court of the State of New York, County of New York) (Complaint dated June 16, 1983 and service purportedly effected on that date); *see* Motion to Recuse Judge (filed June 16, 1983) in Misc. Civ. No. H 83–62 at 4 and *In re Anthony R. Martin-Trigona,* 573 F.Supp. 1237 (D.Conn.1983) (ruling on motion to recuse).

Unavoidable exigencies required rescheduling the hearing at issue from June 16, 1983 to June 17.[18] At the hearing of June 17, the court heard lengthy oral argument from counsel for the defendants and from Martin-Trigona. Although the court gave Martin-Trigona an opportunity, which he had sought, to present testimony, he chose to forego that opportunity.[19] After having heard argument, the court issued its injunction.[20]

It should be stressed that, though the Order is sweeping, it is not absolute in any respect. Thus, although many restraints upon Martin-Trigona's litigiousness are imposed, the Order is tailored to ensure that any proper claim will receive appropriate consideration.

While the Order bars Martin-Trigona from initiating new interlocutory appeals, it does permit him to seek leave to file a consolidated appeal once the Bankruptcy Court has disposed of the matters before it.

Similarly, although the Order requires Martin-Trigona to seek leave of the court before commencing a new action, it does not preclude the institution of a new action in a proper case. Thus, Martin-Trigona's access to the courts is not cut off. What the Order does is provide that any court before which Martin-Trigona seeks to maintain a new action or what purports to be a new action will be advised of Martin-Trigona's previous litigation. The Order also curbs Martin-Trigona's ability to surprise persons not named as defendants or otherwise involved in his litigations by suddenly attacking them in papers filed in seemingly unrelated cases. That device, a favorite of Martin-Trigona's,[21] causes special hardship to individuals so attacked, and confounds the administration of cases brought by Martin-Trigona.

### III.

Although many other courts have faced litigants who frivolously and vexatiously

---

18. *See* Tr. (June 17) at 3.

19. *Id.* at 69–71, 83, 85, 107.

20. *See* note 3, *supra* and accompanying text.

21. *See, e.g., Martin-Trigona v. Brooks & Holtzman, supra;* Martin-Trigona's attacks upon Richard Belford, the trustee in bankruptcy of the individual estate of Martin-Trigona, are a paradigm of Martin-Trigona's technique of terrorizing persons wholly unrelated to Martin-Trigona and any of his pending litigation merely because they are or may be related to one of the major targets of his animus. Although Jacob Belford died two weeks before the appointment of his son, Richard, as a trustee in bankruptcy, and although Jacob Belford apparently had never heard of Martin-Trigona, the latter sued the estate of Jacob Belford as well as his widow and Richard Belford's brother (neither of whom had heard of Martin-Trigona before the lawsuit). *See, e.g.,* Tr. (June 17) at 78–81. Elliot B. Pasik, an attorney whose sin appears to have been his association with the law firm retained by Richard Belford's professional liability insurance carrier to defend a frivolous action by Martin-Trigona against Belford and his relatives in the Supreme Court of the State of New York, wound up as a defendant in a federal suit charging him and his law firm with violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) ("RICO"), for hav-

ing provided "limited assistance to *pro se* [co-]defendants" in the state lawsuit. *Martin-Trigona v. D'Amato & Lynch,* 559 F.Supp. 533, 534–535 (S.D.N.Y.1983) (Pollack, J.) (holding, *inter alia,* that the actions alleged did not constitute a violation of RICO and that "entering default judgments for *pro se* parties ... does not constitute mail or wire fraud"). Mr. Pasik's unhappy entanglement with Martin-Trigona persists despite his departure in July 1983 from D'Amato & Lynch. Doubtless aware that the innocent do not lightly react to seeing their names in captions of lawsuits, however frivolous, Martin-Trigona apparently filed an appeal of these very cases in the Court of Appeals under the fictitious caption of *Martin-Trigona v. Elliot B. Pasik, et al.,* Dkt. No. 83–7534 (suits in which Pasik was never a party). *See* Letter from Elliot B. Pasik to A. Daniel Fusaro, Clerk, United States Court of Appeals for the Second Circuit (dated Aug. 31, 1983). *See also, e.g.,* Motion to Hold Scwartz [sic], Engleman & Greer in Contempt (filed June 16, 1983) (Court Exhibit 12, Hearing of June 28, 1983) (moving that persons not connected to the litigation before the court, including my spouse, be held in contempt); Motion to Order the Return of Stolen Funds By Nicholas Bua and His Law Firm Greenfield, Krick & Jacobs in Civil Action No. H 83–62 (filed June 16, 1983) (Court Exhibit 13, Hearing of June 28, 1983) (directed at my personal counsel, whose partner had once had a fleeting and now irrelevant contact with Martin-Trigona). *See* note 7, *supra.*

multiplied suits or who sought endlessly to raise anew stale claims, and although other courts have, in appropriate circumstances, taken the unusual step of enjoining particular plaintiffs from commencing future actions, *see, e.g., In the Matter of Hartford Textile Corp.*, 681 F.2d 895 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983); *Gambocz v. Yelencsics,* 468 F.2d 837 (3d Cir.1972); *In re Green,* 669 F.2d 779 (D.C.Cir.1981); *Meredith v. John Deere Plow Co.*, 261 F.2d 121 (8th Cir.1959); *Kane v. City of New York,* 468 F.Supp. 586 (S.D.N.Y.) (Weinfeld, J.), *aff'd,* 614 F.2d 1288 (2d Cir.1979); *Adams v. American Bar Association,* 400 F.Supp. 219 (E.D.Pa.1975), it does not appear that our federal courts have, in the past, been confronted with a litigant of quite Martin-Trigona's character. His prolificity is remarkable, as is shown by the appendices to the Order, but it is not, in itself, unique. More important is Martin-Trigona's range: while some litigants have burdened the courts with repeated constitutional claims or suits under 42 U.S.C. § 1983, or with a host of claims deriving from a single transaction, Martin-Trigona has sued under many statutes, has alleged hundreds of different causes of action, and has maintained an active presence before several bankruptcy courts and administrative agencies as well as district courts and courts of appeals. Nor, of course, has he confined himself to federal litigation.

There are, however, several features that mark Martin-Trigona's litigiousness as truly distinctive. First, he has had the benefit of legal training, which education he has abused but not ignored. Familiar as he is with the workings of court and agency, Martin-Trigona is far better situated to subvert those processes through calculatedly irregular filings than is the ordinary *pro se* suitor. At the same time, Martin-Trigona is not, of course, a member of the bar. Many of his actions and much of his conduct, if undertaken by an attorney, would most likely result in disciplinary proceedings. But such a sanction is not available in Martin-Trigona's case.

Second, it is clear that Martin-Trigona is not interested in the vindication of some legal right; he does not present the court with the case of a litigant whose claims, however fanciful or improbable, derive from an eccentric but good-faith interpretation of the law. On the contrary, the very purpose of Martin-Trigona's litigation is nothing other than the multiplication of litigation and the harassment of his imagined enemies (and, remarkably, even those having any remote connection with these "enemies") by the use of legal processes. His career in court establishes that, for him, legal trouble is a veritable sport, a means of making life challenging and enjoyable. A malign virtuoso of *pro se* litigation, Martin-Trigona is apparently stimulated by the prospect of drawn-out controversy and complex filings. That conclusion is made inescapable by a review of the record of his career, including the record of the instant cases, coupled with personal observation.

It is quite true that, in the presently pending litigation, Martin-Trigona's pleasure may make some sort of business sense. Judge Lavien of the Bankruptcy Court for the District of Massachusetts, who is presiding over other bankruptcy cases into which Martin-Trigona has insinuated himself, has observed that it may be Martin-Trigona's hope that, by dragging out his litigation, he will force his creditors and those whom he claims are his debtors to submit to compromises they would otherwise have eschewed. *See In re WHET, Inc.*, 33 B.R. 424 (Bkrtcy.D.Mass.1983).

That consideration suggests a third feature of Martin-Trigona's unusual style. Many problematic *pro se* litigants have sued officials arguably well-prepared to defend such actions (such as prison wardens or prosecutors); some repeat litigants have specialized in claims against particular defendants, who, at least, had the benefit of having counsel already familiar with the particular claimant's concerns.

Martin-Trigona has certainly sued his share of officials, especially judges, and

has made a point of continually suing some of his favorite defendants, often in widely separated jurisdictions. *See, e.g.,* Order, ¶ 15, Appendix C, *infra*. But he is also prone to sue persons who have only the slightest connection with him and the legal tumult he has created.[22] For such individuals, notice that they have been sued comes as a shock, as does the ensuing invective Martin-Trigona is apt to heap upon them. Though such suits have, in the past, always been dismissed, usually at the pleadings stage, defendants are nonetheless forced to go to the expense of retaining counsel and are put to the trouble of worrying about their legal position. Because Martin-Trigona is quite capable of manufacturing documents that look and read as if effective, though often invalid,[23] many victims of his litigiousness may be subjected to genuine anxiety before the suits against them are disposed of. It should be noted that defendants are not the only persons so threatened. Martin-Trigona is quite capable of moving to hold in contempt persons who have not previously been named in the litigation.[24]

One remedy for such conduct, in other cases, would be the awarding of costs and fees to prevailing defendants. However, because of Martin-Trigona's bankruptcy, it is unlikely that any defendants winning such awards would ever be able to enforce them. Moreover, it may safely be assumed that the attempt to enforce such an award would be clouded by a new round of litigation and by numerous new actions filed against the particular defendant by Martin-Trigona. A court would hardly be protecting a particular defendant's rights by inviting that person once again to submit him or herself to Martin-Trigona's attacks. Indeed, the invocation of remedies that require litigation for their enforcement would stimulate still more litigation, thereby effectively reinforcing Martin-Trigona's misconduct.

This court, in considering the instant defendants' application for relief, has had every reason to concern itself with the welfare of potential, as well as actual, defendants. It is one of the extraordinary features of Martin-Trigona's style of litigation that he is apt to draw into litigation persons who would not, at the outset, have seemed relevant parties thereto. As already mentioned, he may move to hold persons in contempt or he may sue attorneys representing parties he has already sued.[25] Once Martin-Trigona has begun to litigate in a particular forum, the number of defendants in the various actions he commences is likely to mount in geometric progression.

When one considers the several unique features of his style of litigation, when one considers furthermore the extent to which he has succeeded in multiplying lawsuits around the country, and when one notes the utter frivolousness of almost all of that litigation, it is apparent that only extraordinary relief is appropriate. The necessity of such a remedy is emphasized by the remarkably vicious, derogatory, and personal character of the suits that Martin-Trigona files and the manner in which he publicizes them. His pleadings are often laced with scurrilous attacks upon those whom he chooses to sue, attacks in which ethnic and religious slurs are prominent,[26] along with manifold accusations of criminal activity. It has become Martin-Trigona's practice to forward copies of such pleadings to the press, where they are often given currency. Dismissal of an action, of course, rarely receives the same publicity as does news of the filing of a complaint, and when, as is often true of Martin-Trigona's cases, the dismissal is based on failure of service, the outlandish charges contained in the complaint may go unaddressed by court or defendant.

---

22. *See, e.g.,* note 21, *supra*.

23. *See, e.g., Martin-Trigona v. Shiff, supra,* 702 F.2d at 386 n. 11.

24. *See e.g.,* note 21, *supra*.

25. *See* note 21, *supra*.

26. *See* Order, ¶ 8, Appendix C; *see* note 7, *supra*.

For any judge, lawyer, or legal scholar who cherishes the ideal of the American system of justice that the courts remain open for all, the prospect of enjoining a litigant from future actions is not a happy one. This court has reached its decision to grant the unusually broad injunction sought by defendants in this case only because Martin-Trigona represents an unusually broad threat to the rights of these defendants and future defendants, as well as to the sound administration of justice. Were there any other way of redressing or preventing the injuries caused or threatened by Martin-Trigona's style of litigation, this court would gladly embrace that alternative.[27] After much reflection, however, the court has reluctantly concluded that there is simply no other way.

Any alternatives would be either too weak or too severe; and, in any event, they would not ensure the prospective relief necessary here. Economic sanctions—such as awards of costs or fees—would plainly be unavailing, given Martin-Trigona's bankruptcy and the certainty that he would contest payment of such awards, thus spawning further litigation and fostering the sort of chaos Martin-Trigona so clearly relishes.[28] The sanction of contempt, more formidable than an equitable injunction, effects a more striking limit on access to the court, while also being defective in its failure to provide prospective relief.

Prospective relief is the heart of the problem, which is why an injunction is so appropriate in this case. Foremost among this court's concerns has been the situation of the defendants yet to be sued by Martin-Trigona. Apart from this injunction, there is no way of heading off a suit by Martin-Trigona, because his choice of targets is not rational; rather, he is apt to fasten on anyone who has suffered the slightest contact with him. One made a defendant by Martin-Trigona will necessarily be put to the expense of retaining counsel and to the discomfiture of having wild allegations about one's conduct submitted to the press and the public at large in the guise of filings with a court.

It cannot be imagined that the courts are utterly powerless to prevent Martin-Trigona from accomplishing his objective of inflicting harm upon the system for the administration of justice, defendants herein and countless others by continuing abuse of the legal process. The remedy here may be unique, but it is an appropriate response to what may well be a unique harm.

---

**27.** The court is mindful that it may at any time "order stricken from any pleading any ... immaterial, impertinent or scandalous matter[,]" Rule 12(f), Fed.R.Civ.P., but it is clear from this record that the use of Rule 12(f) would not cure the various harms which Martin-Trigona has inflicted, and threatens to inflict, upon innocent persons and the courts in many different jurisdictions by the commencement and frantic prosecution of frivolous and vexatious litigation. In the absence of an adequate remedy at law, only an injunction can provide relief from the actual and imminent harm inflicted by Martin-Trigona's abuse of the legal process. *Beacon Theaters v. Westover,* 359 U.S. 500, 506–507, 79 S.Ct. 948, 954–955, 3 L.Ed.2d 988 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies"); *Jack Kahn Music Company, Inc. v. Baldwin Piano & Organ Company,* 604 F.2d 755, 758–759 (2d Cir.1979).

**28.** *See* note 27, *supra.*

## APPENDIX A

Typically, the assault-by-litigation upon chosen targets includes lawsuits (or the service upon persons, however marginally related to Martin-Trigona, of papers that seem to relate to litigation) across a broad terrain. As Judge Weinfeld noted in *Martin-Trigona v. Brooks and Holtzman, supra,* 551 F.Supp. at 1384, Brooks' routine and innocent motion to admit Coan in the Southern District of New York "did not injure Martin-Trigona in any respect," but it precipitated a lawsuit and a complaint with the Disciplinary Committee of the New York State Supreme Court. And more:

> The vindictive nature of his action is emphasized by the fact that simultaneously with the commencement of the action against the attorneys, he purported to serve a "lis pendens" to "Banks & Trust Companies, Secretary of State, credit companies, mortgagees, title holders *and all other persons with an interest in the claims or assets of the above named defendants,* advising them that he had commenced the action against the defendants and that *"a lien is claimed on any and all assets of the defendants within the State of New York." This conduct is typical of this plaintiff.*

*Id.* (emphasis supplied).

The pattern of abuse is remarkably consistent in the years since Martin-Trigona first reached the eminence of the law reporters. *See, e.g., In re Martin-Trigona, supra,* 302 N.E.2d at 72–73 (noting application in 1972 for hearing to determine state judge's "sanity, competence and fitness to hold judicial office"; castigation of opposing counsel as "unscrupulous and incompetent" and "illegally" representing a municipality; publishing a written description of an attorney as a "palsied lunatic" and as "shaking and tottering and drooling like an idiot, ... a physically and mentally sick man[.]"; *Martin-Trigona v. Gouletas,* 634 F.2d 354, 355 n. 1 (7th Cir.1980) (per curiam) (in a case involving Martin-Trigona's bad faith refusal to answer questions concerning his assets, court noted and denied Martin-Trigona's motion to disqualify all judges of the Seventh Circuit or, alternatively, all judges who participated in an earlier appeal); *id.* at 362 & n. 12 (noting Martin-Trigona's "tendency ... to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him[,]" and a motion filed by him in a trial court captioned "Motion to Reassign Case to New Judge—'Plaintiff seriously doubts he can get a fair trial from any of the Nixon-Agnew-Percy-Jenner-Ford judges, or machine judges[.]' "); *United States v. Martin-Trigona,* 684 F.2d 485, 490 n. 6 (7th Cir.1982) (noting that "stories about Martin-Trigona's clashes with the appellate and district court judges in [the Seventh Circuit] are legion[,]" and "that Judge Holder of the Southern District of Indiana was assigned to preside over this trial only after all the judges in the Central District of Illinois recused themselves because of prior run-ins with [Martin-Trigona]."); *Martin-Trigona v. Shiff,* 702 F.2d 380, 382 n. 1 (2d Cir.1983) (noting that "Martin-Trigona's name has appeared on the docket of nearly every district judge as well as bankruptcy judge in the District of Connecticut"); *In re WHET, Inc.,* 33 B.R. 424 (Bankr.D.Mass. 1983), at 425 n. 5 (noting increasingly more abusive pleadings by Martin-Trigona, and quoting Martin-Trigona's application for writ of habeas corpus in which Martin-Trigona charged that "Ferrari, Lavine, Goodwin Procter & Hoar [counsel to trustee] and other bankruptcy scum acted, combined and conspired to kidnap Martin-Trigona ... for the purpose of stealing the debtor [sic] and converting these assets for the benefit of the bankruptcy scum ring."); *id.* at 431 & n. 15 (noting affidavit filed by Martin-Trigona against an attorney who had represented him in bankruptcy matter, *see In re WHET, Inc.,* 12 B.R. 743, 746 [Bkrtcy.D.Mass.1981], accusing attorney of fraudulent behavior); *id.* at 431 (reciting Martin-Trigona's allegation that bankruptcy judge, and/or his immediate family, other relatives, former law firm, or other professional associates were directly enjoying the proceeds of the sale of the radio station, or indirectly doing so by having a

disqualifying financial interest in the situs of the funds, or that bankruptcy judge knowingly assisted the trustee, counsel to the trustee, or some other functionary in personally benefitting from these funds); *id.* at 432 (noting that Martin-Trigona sought bankruptcy judge's recusal because Martin-Trigona had filed lawsuits against judge and others, and had requested certain federal agencies to investigate judge, and the other three bankruptcy judges in the District of Massachusetts, the United States Trustee, the trustee and the trustee's attorney, as well as twelve members of the attorney's law firm, alleging violations of the federal anti-racketeering statute); *id.* at 432 (noting a Martin-Trigona letter to the District Director, Internal Revenue Service, Boston, captioned "Re: Complaint Against Harold Lavien and Request for Informer's Payment"; a Martin-Trigona letter to the Criminal Division, United States Attorney's Office, Boston, captioned "Re: Fraud and theft in bankruptcy court"; a Martin-Trigona letter addressed to the judges of the Court of Appeals for the First Circuit captioned "Emergency Request for Investigation by the Circuit."); *id.* at 433 n. 19 (quoting from claim apparently filed February 11, 1983 under Federal Tort Claims Act against bankruptcy judge and United States Trustee for the District of Massachusetts, describing an "accident" as follows: "In 1980, I was kidnapped, in my absence [sic] a bankruptcy ring composed of Harold Lavien, William Tucker and other operators seized and stole my property, and parcelled it out to their friends unlawfully. Their agents also had me beaten and tortured in county jails, and dragged in chains around the country to prevent me from going to the court to protect my property. The defendants/federal agents are liable for the acts of their coconspirators."); *id.* at 433 (noting Martin-Trigona's February 28, 1983 letter to the Foreman and Grand Jury for the District of Connecticut requesting that the Grand Jury "open an independent investigation into fraud and criminal activity in the bankruptcy court system in Connecticut and . . .

related aspects pending in Boston," and Martin-Trigona's allegation that he sought to contact the Grand Jury directly because the United States Attorney "is a friend of the person committing the illegal acts"; and noting Martin-Trigona's conclusions in his affidavit that bankruptcy judge and trustee's counsel "are subjects of an active and ongoing investigation."); *id.* at 436 (noting Martin-Trigona's "steady stream of invectives and frequent claims he needs a new judge because no lawyer is willing to appear before bankruptcy judge on Martin-Trigona's behalf, because of 'widespread view that [bankruptcy judge] is part of the 'Bankruptcy Ring.' ' "); *In re WHET, Inc.*, 12 B.R. 743, 747 n. 2 (Bkrtcy.D.Mass.1981) (noting that Martin-Trigona not only offered no constructive assistance in the administration of his estate but had, instead, "attempted to thwart the efforts of the Trustee at every stage"; Martin-Trigona "first filed in New York where the court found no basis, he attempted to have the Trustee removed, he opposed the borrowing of even insignificant amounts necessary for improved operations, he brought suit against the [radio station's] general manager, he objected to the sale of excess equipment, he now seeks a transfer of venue, and he has filed multiple pleadings before the F.C.C. seeking first to block and then revoke the transfer of the station's license to the Trustee.")

This pattern of misconduct by Martin-Trigona is fully evident in the record of these cases. *See, e.g.*, Order, ¶ 9, Appendix C, *infra* at 1261 *et seq. See also* Certified Official Transcript of Status Conference of October 25, 1982 in Civil No. H 82–694, Civil No. H 82–695, Civil No. H 82–708 and Civil No. H 82–709 (filed Aug. 29, 1983) at 14, 21 (alleging that Connecticut attorney purportedly hired by him had "defrauded [the Bankruptcy Court] by entering a false appearance . . . ."); *id.* at 23–24 (alleging that counsel for the estates in these cases "filed secret pleadings and memoranda with the judge"; that court papers had "disappeared from the file"; that upon the transfer of the Martin-Trigo-

na cases from Judge Shiff to Judge Krechevsky "immediately [Judge Shiff] started having secret telephone calls with Judge Krechevsky to prejudice him"); *id.* at 25–27 (alleging that counsel of record and the District's two bankruptcy judges are part of "a little club ... the bankruptcy ring ... a bunch of lawyers [who] get together with the judge, they meet every day in secret, they shove everybody else" and who are "all corrupt and the record shows it ... [and] a bunch of crooks"); *id.* at 47–51 (alleging that counsel representing real parties in interest in the case ultimately reported as *Martin-Trigona v. Shiff,* 702 F.2d 380 [2d Cir.1983], "defraud[ed] this court and the Circuit when he claimed he was attorney for Alan Shiff"); *id.* at 53 ("I happen to think [Bankruptcy Judge] Roy Babbitt is an idiot ... *but* I don't think he's a crook." [emphasis supplied] ); *id.* at 56–57 ("So they [presumably counsel of record and the District's bankruptcy judges] have literally shanghaied my assets and now they want to keep rubber stamping it"); Letter of Anthony R. Martin-Trigona to José A. Cabranes and John K. Henderson, Jr., Deputy-in-Charge, Office of the Clerk, Hartford (dated June 10, 1983 and docketed by the court on June 14, 1983, along with endorsement order thereon) (Court Exhibit 7, Hearing of June 28, 1983) (objecting, *inter alia,* to the service of papers on him at his residence address, an action apparently deemed characteristic of "the bullies in the federal courts in Connecticut [who] stooped to trying to rape my mother"—a rape purportedly "attempted by neither of [the addressees of the letter] but, rather by the Bankruptcy Jews in Bridgeport (Shiff, Coan, Belford, Perlmutter and Meister)").

## APPENDIX B

*See* the court's order in Misc.Civ. No. H 83–62 entered on May 6, 1983, in which the court, pursuant to § (c)(2) of the Emergency Resolution for Administration of Bankruptcy System, adopted by the judges of this District on December 22, 1982, directed that "all matters now pending in the United States Bankruptcy Court regarding Anthony R. Martin-Trigona or New Haven Radio, Inc. be transferred from the Bankruptcy Court to this court"; consolidated all of these actions for pretrial purposes and stayed the actions in all respects pending further order of the court; scheduled a hearing for June 6, 1983 on all pending motions and proceedings (including a motion for immediate incarceration of Martin-Trigona as a contemnor); and, pending the June 6, 1983 hearing, directed the parties to file no further pleadings or other papers on any motion or application, except as provided by the court in that order.

By an order of May 12, 1983, the court clarified its May 6, 1983 order "by indicating that that order and all subsequent orders in Misc.Civ. No. H 83–62 (consolidated cases and proceedings) shall be deemed, unless otherwise indicated by the court, to apply to any and all proceedings within the District of Connecticut involving Mr. Martin-Trigona, regardless of where originally filed or by whom originally filed." In a letter to the Clerk dated May 12, 1983, incorporated by reference in the court's order of that date, the court noted that since Chief Judge Daly in January 1983 ordered that all matters relating to these parties be assigned for all purposes to me,

I have been attempting to obtain a completed and accurate catalog of pending actions, appeals, motions, objections, *etc.* This has been a difficult undertaking, and at a hearing in open court on January 12, 1983 (at which Mr. Martin-Trigona was present), I directed Attorney Richard Coan to submit certain information to the court regarding pending matters, in order to facilitate the court's efforts to obtain a portrait of pending proceedings as of a particular date. I now ask you and your colleagues to assist me in this continuing endeavor by preparing, by not later than May 31, 1983, an up-to-date compendium of pending matters (as of the date of the entry of my order on May 6, 1983), so that in due course this compendium (or the court's version thereof) may be shared with the parties, be made an exhibit in these proceedings and be relied upon by the parties and the court in considering how these matters ought to be treated or "managed" in the future.

Letter from José A. Cabranes to Sylvester A. Markowski, Clerk of Court, dated May 12, 1983; *see* Letter from John K. Henderson, Jr., Deputy-in-Charge, Office of the Clerk, Hartford, to José A. Cabranes (dated May 31, 1983) in Order, Appendix II, *infra* at 1261, 1269; *see also* Court Exhibit 2, Hearing of January 6, 1983 (compilation of all pending Connecticut matters involving Anthony R. Martin-Trigona, 53 actions in all). These initial efforts to "manage" the Martin-Trigona cases had not suggested any view on the merits of any of these cases, and prompted a rhapsodic response by Martin-Trigona:

First, I want to thank you from the bottom of my heart for removing my cases from the bankruptcy court system .... I have been delivered by your order from the excruciating conditions in the bankruptcy court. I am eternally grateful. You have at least broken the impasse. Whatever your future action in these cases, my thanks to you will remain for having removed these cases from the bankruptcy court.

Second, you may be assured of my *full, complete* and *undivided* cooperation .... I do not believe I will disappoint you.

Finally, I want to inject a very personal note. During the depths of my depression, when many around me had lost hope of my survival, and the criminal conspiracy was succeeding, in November 1981, I sat night after night in the lonely law library at Ashland, Kentucky reading cases to preserve my sanity in the face of the insane treatment at the hands of the courts.

I chanced across *LaReau v. Manson*, 507 F.Supp. 1177 (D.Conn.1981) aff'd as mod. 651 F.2d 96 (2d Cir.1981) (sic). I was immediately impressed by your thoroughness, your scholarship and your humanity. I prayed then that it might be possible to appear before you to resolve the tortures I was experiencing in the bankruptcy courts of Connecticut. In November, 1981 that looked like a hope-less prayer. Yet, here we are in 1983, appearing before you in a series of proceedings that will finally end this misery, one way or the other. God works in strange ways, but he always works, and he always prevails . . . .

Letter of Anthony R. Martin-Trigona to José A. Cabranes (dated May 17, 1983) (Defendant's Exhibit 8, Hearing of June 20, 1983).

APPENDIX C

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

In re ANTHONY R. MARTIN–TRIGONA

MISC. CIV. NO. H 83–62

(Consolidated Cases)

ANTHONY R. MARTIN–TRIGONA

v.

HAROLD LAVIEN, et al.

CIVIL NO. H 83–305

ANTHONY R. MARTIN–TRIGONA

v.

WILLIAM F. SMITH, et al.

CIVIL NO. H 83–322

ORDER OF PERMANENT INJUNCTION

June 23, 1983

Pursuant to motion made by the federal defendants in the above-captioned case of *Martin-Trigona v. Lavien,* Civ. No. H 83–305, and in order to maintain the status quo in all pending civil actions filed by Anthony R. Martin-Trigona in this District and in the consolidated bankruptcy appeals and other actions captioned as *In re Anthony R. Martin-Trigona,* Misc.Civ. No. H 83–62, this court issued on June 8, 1983 a temporary restraining order under Rule 65, Fed. R.Civ.P. That order prohibited Anthony R. Martin-Trigona "from the filing of any action, in any court in the District of Connecticut, arising out of the acts of any person or entity involved in any capacity with either the litigation of any bankruptcy proceeding involving plaintiff [Anthony R. Martin-Trigona] or any of his properties filed on or before the date of this order or the litigation of any civil action relating to such bankruptcy proceedings and filed by him as plaintiff or party of interest." That order further set a hearing for consideration, upon notice, of an application for a preliminary injunction for June 16, 1983 at 9:00 a.m. Unavoidable necessity compelled the court to continue that hearing to June 17, 1983 at 10:00 a.m., at which time defendants in Civ. No. H 83–322 joined in the motion for injunctive relief.

All necessary parties, including Anthony R. Martin-Trigona, were present on June 16, 1983 and were informed by the court of the necessity for a continuance and of the time and place of the continued hearing.

Taking specific notice of the contents of the *amicus curiae* brief of the United States filed in Misc.Civ. No. H 83–62; of the contents of the federal defendants' motion to strike, to dismiss, and for injunctive relief (dated May 31, 1982 and filed in this court on June 2, 1983); of the arguments of all of the parties; of all the evidence presented; of the full record of the above-captioned cases; and of actions filed in this and other courts; and the court concluding that all relevant evidence has been considered, the court finds:

1. That Anthony R. Martin-Trigona is a *pro se* litigant who has filed more than 250 civil actions, appeals, and other matters in little more than a decade. *See* Appendix 1 (listing all such matters known to this court) and Appendix 2 (a list prepared by the Clerk of the Court, in response to a specific inquiry by this court, recording the number of such matters pending in this District or initiated in this District and now before the Court of Appeals).

2. Anthony R. Martin-Trigona is an experienced *pro se* litigant. He has represented himself in most, if not all, of the matters listed in Appendices 1 and 2. "Anthony Martin-Trigona is not a stranger to the federal courts." *Martin-Trigona v. Shiff,* 702 F.2d 380, 382 (2d Cir.1983). Moreover, "Martin-Trigona is not your typical *pro se* advocate. The bankruptcy court [for the District of Connecticut] noted that he is 'a graduate of law school, [and has] demonstrated throughout several days of proceedings and innumerable motions, applications and briefs that he was knowledgeable in the bankruptcy field.' [Citations omitted.] Martin-Trigona's name has appeared on the docket of nearly every district judge as well as bankruptcy judge in the District of Connecticut." *Id.* at 382 n. 1, *quoting In re Martin-Trigona,* 16 B.R. 792, 793 (Bkrtcy.D.Conn.1982).

3. Anthony R. Martin-Trigona is knowledgeable in the law and articulate. He

was, as already noted, graduated from law school and passed the Illinois Bar Examination. His application for admission to the Illinois bar was denied, despite his possession of "the requisite academic qualifications to practice law," because "he lacks the qualities of responsibility, candor, fairness, self-restraint, objectivity and respect for the judicial system which are necessary adjuncts to the orderly administration of justice," *In re Anthony R. Martin-Trigona,* 55 Ill.2d 301, 302 N.E.2d 68, 74 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). *See also Martin-Trigona v. Underwood,* 529 F.2d 33 (7th Cir. 1975).

4. Anthony R. Martin-Trigona has pursued his numerous legal actions with persistence, viciousness, and general disregard for decency and logic. This court takes judicial notice, as Judge Weinfeld did only recently in related litigation, "that Martin-Trigona has over the years filed a substantial number of lawsuits of a vexatious, frivolous and scandalous nature. He has been a persistent and calculating litigator. There is a long trail of such actions commenced by him against federal and state judges, bar examiners, public officials, public agencies, lawyers and individuals who in one way or another had any relationship, directly or indirectly, to any matter concerning him." *Martin-Trigona v. Brooks & Holtzman,* 551 F.Supp. 1378, 1384 (S.D. N.Y.1982). Martin-Trigona's "tendency . . . to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him is evident from many of his filings in this record," *Martin-Trigona v. Gouletas,* 634 F.2d 354, 362 (7th Cir.1980). In the present case, Anthony R. Martin-Trigona has run true to form. "His tour through the court system is marked by a persistent refusal to cooperate with court orders and purposeful efforts to delay and jaundice court proceedings. His distinctive brand of *pro se* advocacy has reached [the Court of Appeals] after a barrage of procedural and jurisdictional chal-

lenges which have frustrated the courts below and have caused these bankruptcy proceedings to advance at a snail's pace, with little progress made toward settling creditors' claims during the past two and one-half years." *Martin-Trigona v. Shiff, supra,* 702 F.2d at 382.

5. Anthony R. Martin-Trigona has recently advised one court that additional complaints are forthcoming: "This is to advise the Court that new law suits in New York seeking to litigate these issies [sic] are being submitted to an Article III court, and that a renewed motion to recuse the bankruptcy court is being prepared." Jury Demand and Article III Court Demand (filed May 2, 1982), *In re WHET, Inc.,* No. 80–1542–HL (Bkrtcy.D.Mass.).

6. In recent months, lawsuits naming some or all active District Judges and Bankruptcy Judges in the District of Connecticut have purportedly been commenced by Anthony R. Martin-Trigona. Since May 2, 1983, Anthony R. Martin-Trigona has filed three suits against one of the federal defendants in the above-captioned case of *Martin-Trigona v. Lavien.* Furthermore, in a motion to recuse (filed June 16, 1982) submitted in the above-captioned cases (and denied in a separate order and accompanying ruling), he has threatened the filing of additional suits: "The debtor will be seeking legal redress from the obvious pattern of fraud, conflict of interest, and abuse of judicial power by the court, its family, and a series of law firms connected by common bonds of greed and religion, all who [sic] are trying to loot debtors and illegally jail debtors." Indeed, documents purporting to relate to a lawsuit filed in the Supreme Court of New York and naming the undersigned as a defendant have recently appeared, suggesting that this threat has been, at least in part, fulfilled.

7. Litigation is extremely costly to the parties and to the court in the expenditure of both money and time. As recently observed by the Supreme Court, "even the processing of a complaint that is dismissed before trial consumes a considerable amount of time and resources." *Briscoe v. Lahue,* —— U.S. ——, ——, 103 S.Ct. 1108,

1120, 75 L.Ed.2d 96 (1983). As demonstrated by Appendix 2 and the record of those cases, this court is already inundated by actions brought by Martin-Trigona and by a wide array of motions, applications, appeals, *etc.*, filed by him in those cases. It should be noted that many of the files in these cases are voluminous, often inflated by Martin-Trigona's masses of paper. The sporadic and erratic closing and reopening of cases, the repetition of the same claims in multiple files, and the sudden introduction of new matters into otherwise unrelated actions have all posed a burden to clerical and judicial operations alike and become a serious impediment to the administration of justice. These concerns make injunctive relief appropriate even though it might be possible for defendants in Martin-Trigona's actions to respond to his pleadings with numerous motions to strike, pursuant to Rule 12(f), Fed.R.Civ.P.

8. Anthony R. Martin-Trigona's recent suits have taken on the ugly taint of anti-Jewish bigotry and suggest a substantial deterioration of an already problematical personality. In one such action, of which this court takes judicial notice, he referred to a United States Bankruptcy Judge as a "crooked, slimy Jew, who has a history of lying and thieving common to members of his race." *Martin-Trigona v. Lavien*, Civ. No. 83–2944 (S.D.N.Y.), Unsworn Declaration in Support of Motion to Recuse, ¶ 2. The complaint in the above-captioned case of *Martin-Trigona v. Lavien*, Civ. No. H 83–305 (D.Conn.), is replete with such accusations and charges, of which the following excerpts are cited as examples:

> This is a civil rights law suit against a group of Jews [who have] conspired ... to steal plaintiff's property .... (Complaint, ¶ 4).
> [T]his property was seized by the defendant Jews. (*Id.* ¶ 6).
> [T]he "bankruptcy judges" ... have been Jews. (*Id.* ¶ 7).
> [T]he trustees ... have been Jews. (*Id.* ¶ 8).

> [T]he counsel for said trustees have been Jews. (*Id.* ¶ 9).
> The Jews speak and intrigue among themselves .... (*Id.* ¶ 10).
> [They] meet in secret ... to determine how to loot plaintiff's property. (*Id.* ¶ 11).
> ... Jewish bankruptcy judges appoint Jewish bankruptcy trustees who choose Jewish lawyers to represent them. (*Id.* ¶ 14).
> ... Jews, historically and in daily living, act through clans and in wolf pack syndrome .... (*Id.* ¶ 15).
> ... Jews hate Christians, and have paranoid delusions .... (*Id.* ¶ 16).
> Jews work through a national network. (*Id.* ¶ 17).
> Non-Jewish lawyers in Connecticut refer to the Jewish cabal, euphemistically, as "Ali Baba and the Forty Thieves," .... (*Id.* ¶ 18).
> No sociological evidence exists that Jews have superior intelligence or any other special characteristics, other than the herd instict [sic] .... (*Id.* ¶ 20).
> The plaintiff ... is beset by a horde of bankruptcy Jews who are trying to steal his property .... (*Id.* ¶ 21).

9. Anthony R. Martin-Trigona has demonstrated a propensity for bad faith acts. The Supreme Court of Illinois found that a description contained in plaintiff's bar application was a "gross mischaracterization." *In re Martin-Trigona*, 55 Ill.2d 301, 302 N.E.2d 68, 71 (1973). The court also found that plaintiff had "made charges ... that were untrue, scurrilous and defamatory ...," and that, "he made a number of frivolous demands. ...." *Id.* The court concluded that plaintiff's conduct reflected "his propensity to unreasonably react against anyone whom he believes opposes him ...." *Id.* More recently the Court of Appeals noted that "[t]he Seventh Circuit was faced with Martin-Trigona's bad faith refusal to answer questions concerning his assets, ... and his motion to disqualify all of the judges of the Court of Appeals .... We note that he has tried a similar tactic in the district court here." *Martin-Trigona*

*v. Shiff, supra,* 702 F.2d at 382 n. 1 (citations omitted).

10. Anthony R. Martin-Trigona has repeatedly, scandalously, and vexatiously accused those judges who have sat on cases in which he has involved himself and those counsel who have appeared in such cases of conflicts of interest, of conspiracy, and of criminal activity. His accusations have often been personal, have often emphasized racial or religious affiliations, and have often involved the members of those judges' and counsel's families. *See In re WHET, Inc.,* 33 B.R. 424 (Bkrtcy.D.Mass.1983).

11. It is Anthony R. Martin-Trigona's apparent purpose to prevent the orderly administration of the bankruptcy estates at issue in the above-captioned actions through the filing of numerous frivolous motions, especially for recusal and to hold one or another attorney in contempt. "It may be that Mr. Martin-Trigona, recognizing his legal and factual problem, is attempting by his wild accusations of venal conduct on the part of all the lawyers, trustees, and bankruptcy judges involved in the administration of the estates in both Massachusetts and Connecticut, in the words of former Justice Jackson, to pound loudly on the table in the hope that if he becomes enough of a problem, that by either intimidation or weariness, he may accomplish some part of his purpose. Since he is already in bankruptcy, what does he have to lose? The result is that the accusations increase, the motions, the pleadings, complaints, and suits multiply, courts and lawyers are buried in mountains of time-consuming paper. If there is one truth, it is that the estate will be bled white by the costs and legal fees engendered by his 'crusade.'" *In re WHET, Inc., supra,* 33 B.R. at 434. *See also id.* at 434, n. 21 (quoting Martin-Trigona's statement at oral argument, "You [*i.e.,* the court] will go to bed at nights saying I wish that Martin-Trigona case would go away.").

12. Pursuant to Rule 201, Fed.R.Evid., the court takes judicial notice of the fact that racial, ethnic or religious slurs and accusations can reasonably be expected to cause and do in fact cause emotional distress and psychological injury to the persons who are the targets of these slurs and accusations. This court finds that injury to such persons occurs immediately upon the making of slurs and accusations such as those quoted *supra,* ¶ 8, and that psychological and emotional injuries can be and often are permanent in nature. This court further finds that such injuries can be, and in the instant case most probably are, irreparable upon occurrence.

13. The purpose, nature and effect of Anthony R. Martin-Trigona's career in litigation is simply to multiply litigation. Thus, for those victimized by his accusations, including the system for the administration of justice in this District and other jurisdictions where he may bring actions or otherwise interfere in ongoing litigation, there can be no adequate remedy at law. Attempts to respond to this battery of confusing, disorderly and often improperly served pleadings, motions, applications, appeals and statements merely contribute to his own goal, that of involving as many people in as much confounding litigation as possible. The persistence of his litigation thus constitutes an irreparable injury to those who become mired in it.

14. On June 2, 1983 the federal defendants in the above-captioned case of *Martin-Trigona v. Lavien,* Civ. No. H 83–305, filed their motion to strike, to dismiss, and for injunctive relief, which was accompanied by a memorandum in support thereof and a proposed form of order; the text of the motion itself made reference to both accompanying documents. All three documents were served upon Anthony R. Martin-Trigona. The memorandum and proposed form of order make it plain that the federal defendants seek injunctive relief against Anthony R. Martin-Trigona throughout the United States. On June 3, 1983 the court specifically advised Anthony R. Martin-Trigona, present before the court

that day on another matter, that his presence was expected and required on June 6, 1983, at which time the federal defendants' motion would be considered, among other matters. Anthony R. Martin-Trigona having failed to appear in court on June 6, 1983, the court that day issued a *capias* or order of arrest for Anthony R. Martin-Trigona. Although aware of the court's order, he successfully eluded arrest until he appeared at the United States Courthouse in Hartford for a hearing scheduled for June 16, 1983, all the while continuing unabated filings in these cases. On June 8, 1983, the court entered an order temporarily restraining Anthony R. Martin-Trigona from commencing any new actions, with certain specified exceptions, in the District of Connecticut, and an order that he should show cause on June 16, 1983 why the federal defendants' motion for a preliminary injunction should not be granted. As noted *supra*, at ¶ 2, Anthony R. Martin-Trigona was informed by the court of the continuance of that hearing to June 17, 1983. While the temporary restraining order entered on June 8, 1983 was geographically limited to Connecticut, Anthony R. Martin-Trigona was on notice that the injunctive relief sought by the federal defendants would be nationwide.

15. While nationwide injunctive relief is an extraordinary remedy, going beyond even the type of order approved in *In re Green*, 669 F.2d 779 (D.C.Cir.1981), such relief is warranted in the instant case. While Green, at the time he was enjoined, had filed between 600 and 700 complaints, *id.* at 781, Martin-Trigona appears to have filed only a third to a half as many. However, that calculation understates the sweep of Martin-Trigona's litigation, for it omits his activities before federal agencies and United States bankruptcy courts. It also fails to weigh the consideration that Martin-Trigona, being educated in the law, is able to craft superficially coherent and complex complaints and appeals, to prolong individual lawsuits through numerous motions (including many made after entry of judgment), and to insinuate his activities

into legitimate, ongoing proceedings. Thus, unlike Green, Martin-Trigona has managed to have a significant malign effect on judicial administration *to the prejudice of others seeking justice,* notably creditors in the various bankruptcies with which Martin-Trigona has involved himself. Moreover, where Green's suits were apparently most often directed at state and federal officials, Martin-Trigona has also often selected private individuals as defendants. Finally, Martin-Trigona has not been encumbered in his litigation by geographical boundaries. He has been an active litigant in, among others, courts in Massachusetts, Connecticut, New York, the District of Columbia, and Illinois. A defendant in one of the above-captioned cases has already been sued by Martin-Trigona in multiple lawsuits in four different federal courts in three different circuits. In light of all the foregoing, the court finds that nationwide injunctive relief is appropriate.

16. Considering that Anthony R. Martin-Trigona had appropriate and adequate notice that the injunctive relief sought by the federal defendants might be permanent in duration, considering the court's familiarity with the full records of the above-captioned and numerous other related cases (after attempting, over many months, to organize the cases and get the measure of the litigations), and considering that all relevant evidence was now before it, the court concluded at the hearing of June 17, 1983 that consolidation of the hearing on the motion for a preliminary injunction and of the trial on the merits of the federal defendants' motion for a permanent injunction was appropriate pursuant to Rule 65(a)(2), Fed.R.Civ.P.

17. While relief in the form sought by the federal defendants is extraordinary, it is appropriate here, where "suit after repetitious suit," *Hill v. Estelle,* 423 F.Supp. 690, 695 (S.D.Tex.1970), has been filed, where motions to strike are inadequate to deal with the wide variety of vexations posed by these cases, where principles of res judicata and collateral estoppel are powerless to stem the tide of litigation, where there is a consistent pattern of relitigation of frivolous and vexatious claims,

see, *e.g., Adams v. American Bar Association*, 400 F.Supp. 219, 227 (E.D.Pa.1975), and where suits are filed "as a vehicle of harassment by a 'knowledgeable and articulate pro se litigant,'" *Kane v. City of New York*, 468 F.Supp. 586, 590 (S.D.N.Y. 1979) (Weinfeld, J.), *quoting Kane v. Graubard, Moskovitz, McGoldrick, Dannett & Horowitz*, 442 F.Supp. 733, 735 (S.D.N.Y.1977). Where "proceedings initiated and pursued by [a litigant] have been meritless and frivolous . . ., have resulted in vexation, harassment and needless expense to [his adversaries] and have placed an unnecessary burden on the courts and their supporting personnel," the court may give "injunctive relief against vexatious litigation" under the "ancient [power] which has been codified in the All Writs Statute, 28 U.S.C. § 1651(a)," *Matter of Hartford Textile Corp.*, 681 F.2d 895, 897 (2d Cir. 1982). *See also Harrelson v. United States*, 613 F.2d 114, 116 (5th Cir.1980), and *Ward v. Pennsylvania New York Central Transportation Co.*, 456 F.2d 1046, 1048 (2d Cir.1972).

18. At the hearing held in open court on June 17, 1983 on the federal defendants' motion for a permanent injunction, Anthony R. Martin-Trigona was given a full opportunity to present testimony or introduce other evidence in his behalf. He initially indicated that he would be calling several witnesses to prove the existence of a Jewish conspiracy in the United States Bankruptcy Court for the District of Connecticut. The court ruled that such evidence would be excluded. Thereafter, he stated that he himself would testify, and the court indicated that he was welcome to do so. After a recess, Martin-Trigona, under no compulsion from the court or anyone else, elected not to testify and not to call any witnesses or introduce any evidence in his behalf. The court indicated that he was free to pursue that course if he chose, and, indeed, denied an application by defendants' counsel to call Martin-Trigona as a witness.

Anthony R. Martin-Trigona having failed to present any evidence or persuasive argument to suggest why the injunction sought should not issue, the foregoing matters having been considered, there appearing to be no further evidence requiring additional hearing or trial, and the court having concluded that the federal defendants' motion for a permanent injunction is well founded and that nationwide application of that injunction is necessary for the protection of all of the defendants, as well as other persons not participating in this motion and the system for the administration of justice, it is hereby ORDERED:

That, pursuant to Rule 65(a), Fed.R. Civ.P., hearing having been consolidated, the federal defendants' motion for a permanent injunction is granted pursuant to Rule 65(a). Anthony R. Martin-Trigona is hereby permanently enjoined from the filing of any document, motion, affidavit, declaration, or pleading in any pending case brought by him or on his behalf within the District of Connecticut, without first obtaining leave of court. Leave of court shall be obtained only by the lodging of the document in question with the undersigned. Any such document shall be accompanied by a sworn affidavit or unsworn declaration pursuant to 28 U.S.C. § 1746 attesting to the necessity for filing, certifying that the document is submitted in good faith, and indicating the names of those persons upon whom the document is to be served and the address at which service will be made. And it is further ORDERED:

That Anthony R. Martin-Trigona is hereby permanently enjoined from the filing of any action, in any court (state or federal) of the United States, arising out of (1) the acts of any person or entity involved in any capacity with either the litigation of any bankruptcy proceeding involving Anthony R. Martin-Trigona or any of the properties in which he claims or seeks to assert an interest filed on or before the date of this order or (2) the litigation of any civil action relating to such bankruptcy proceedings and filed by him. Upon the conclusion of any bankruptcy proceeding in which Anthony R. Martin-Trigona claims an interest and upon certification by the bankruptcy judge before whom the proceeding was

held and to whom a copy of this order has been provided by Anthony R. Martin-Trigona, together with an application for such certification, Anthony R. Martin-Trigona may file a consolidated appeal from such bankruptcy proceedings, contingent upon the granting of leave by the court in which the appeal is sought to be filed (and pursuant to the terms of the following paragraph of this order). And it is further ORDERED:

That Anthony R. Martin-Trigona is hereby permanently enjoined from filing any new action or proceeding in any court (state or federal) of the United States, without first obtaining leave of that court. In seeking such leave to file Anthony R. Martin-Trigona must comply with each of the following requirements. First, he must file with the complaint a motion captioned, "Motion Pursuant to Court Order Seeking Leave to File." Second, as Exhibit 1 to that motion he must attach a copy of this order. Third, and as Exhibit 2 to that motion, he must attach either a declaration prepared pursuant to 28 U.S.C. § 1746 or a sworn affidavit certifying that the claim he wishes to present is a new claim never before raised by him in any court. Fourth, and as Exhibit 3 to that motion, he must identify by listing the full caption of each and every suit previously filed by him or on his behalf in any court against each and every defendant to the suit he wishes to file. Fifth, and as Exhibit(s) 4 (and continuing as necessary) to that motion he must provide a copy of each such complaint and a certified record of its disposition. Sixth, he must serve a copy of this order on each defendant if and when leave to serve the complaint in the new case is granted. Failure to comply with the terms of this order may be sufficient grounds for a court to deny any motion for leave to file made by Anthony R. Martin-Trigona. Further, the failure by Anthony R. Martin-Trigona to advise a court in which he has filed a lawsuit of this order or to comply with this order may be considered by such court a sufficient defense to sustain a motion to dismiss such a lawsuit. And it is further ORDERED:

That Anthony R. Martin-Trigona is hereby permanently enjoined from the filing of any document, motion, affidavit, declaration, or pleading in any case to which he is not a party without first seeking leave of the court. Leave of the court shall only be obtained by lodging with the court the document sought to be filed, together with a statement setting forth the name(s) of the person(s) to be served and the address(es) at which service will be made, and a motion captioned, "Motion Pursuant to Court Order Seeking Leave to File," to which a copy of this order shall be attached as Exhibit 1. Such leave shall be obtained before the filing of any document, motion, affidavit, declaration, or pleading in any case to which Anthony R. Martin-Trigona is not a party in any court (state or federal) of the United States. And it is further ORDERED:

That Anthony R. Martin-Trigona is hereby permanently enjoined from serving upon any person, natural or legal, or any other entity, any document, motion, affidavit, declaration, or other paper purporting to be served in connection with any legal action unless such an action has in fact been filed in a court (state or federal) the identity of which is apparent on the face of the paper and unless the document, motion, affidavit, declaration, or other paper is properly filed with the court indicated thereon in compliance with the preceding paragraphs of this order.

Further, Anthony R. Martin-Trigona is hereby notified and advised that failure to honor the terms of this order shall subject him to penalties available for contempt of this court, including fine or imprisonment or both.

This order is entered with the following limitations. Nothing in this order shall be construed as having any effect on Anthony R. Martin-Trigona's ability to defend himself in any criminal action brought against him. Nothing in this order shall be construed as denying Anthony R. Martin-Tri-

gona access to the courts through filing of a petition for a writ of habeas corpus or other extraordinary writ. Nothing in this order shall be construed as denying Anthony R. Martin-Trigona access to the United States Courts of Appeals. Nothing in this order shall be construed as affecting any pending action previously brought by Anthony R. Martin-Trigona and presently pending in any state court or any United States Court of Appeals or any United States District Court for any district other than the District of Connecticut.

Upon its entry, this Order of Permanent Injunction supersedes the Order filed June 17, 1983 and the Supplemental Order of Injunction (issued from the bench on June 17, 1983 and entered in written form on June 20, 1983).

This order shall be served upon Anthony R. Martin-Trigona and upon the following counsel of record for both federal and non-federal defendants at the following addresses:

Anthony R. Martin-Trigona
Post Office Box 2002
Rockefeller Center Station
New York, New York 10185

Anthony R. Martin-Trigona
69 West 105th Street
Apartment 4A
New York, New York 10025

Elliot B. Pasik, Esq.
D'Amato and Lynch
70 Pine Street
New York, New York 10270

Irving H. Perlmutter, Esq.
Ullman, Perlmutter & Sklaver
Post Office Box 514
195 Church Street
New Haven, Connecticut 06503

Mr. Daniel Meister
c/o Irving H. Perlmutter, Esq.
Ullman, Perlmutter & Sklaver
Post Office Box 514
195 Church Street
New Haven, Connecticut 06503

Mr. Richard Belford
770 Chapel Street
New Haven, Connecticut 06510

Richard Coan, Esq.
Coan, Lewendon and Royston
18 Trumbull Street
New Haven, Connecticut 06511

Jon Schneider, Esq.
Ms. Laura L. Carroll
Goodwin, Procter & Hoar
28 State Street
Boston, Massachusetts 02109

W. Philip Jones, Esq.
Department of Justice
Post Office Box 888
Ben Franklin Station
Washington, D.C. 20535

IT IS SO ORDERED.

/s/ José A. Cabranes
José A. Cabranes
United States District Judge

APPENDIX I

This appendix lists cases filed by Anthony R. Martin-Trigona throughout the United States. The list was prepared by the United States Department of Justice in consultation with the clerks of many of the following courts (in each of which Anthony R. Martin-Trigona has filed litigation): the United States Supreme Court, the United States Courts of Appeals for the First, Second, Fifth, Sixth, Seventh, Eighth, and District of Columbia Circuits, the United States District Courts for the District of Massachusetts, the District of Connecticut, the Southern District of New York, the District of Columbia, the Eastern District of Virginia, the Eastern District of Kentucky, the Eastern District of Michigan, the Northern District of Illinois, the Central District of Illinois, and the Western District of Missouri, the United States Bankruptcy Courts for the District of Massachusetts, the District of Connecticut, the Eastern District of Kentucky, the Southern District of New York, and the Northern District of Illinois, the Illinois Supreme Court, and the Appellate Court of Illinois.

The list is not complete, with respect to either courts or cases. For example, the present court has had presented to it papers purporting to initiate an action styled *Martin-Trigona v. Cabranes* in the Supreme Court of New York.

It is believed that this appendix understates the scope of Martin-Trigona's litigation in three ways. First, some recent cases are not included, *see, e.g., Martin-Trigona v. D'Amato & Lynch,* 559 F.Supp. 533 (S.D.N.Y.1983). Second, the list omits cases brought by Anthony R. Martin-Trigona in which he is not the first named plaintiff or in which his

name does not appear in the caption at all, *see, e.g., Suskin v. Nixon,* 304 F.Supp. 71 (E.D.Ill.1969), and *United States ex rel. Thompson v. Hays,* 432 F.Supp. 253 (D.D.C.1976). Third, the list omits all agency proceedings involving Martin-Trigona. The court's own research has since uncovered seventeen Federal Communications Commission decisions on complaints, petitions, or requests filed by Martin-Trigona, which may be found at: 67 F.C.C.2d 743, 68 F.C.C.2d 1551, 67 F.C.C.2d 33, 66 F.C.C.2d 968, 64 F.C.C.2d 1087, 67 F.C.C.2d 166, 40 F.C.C.2d 327, 39 F.C.C.2d 25, 39 F.C.C.2d 69, 34 F.C.C.2d 118, 32 F.C.C.2d 649, 26 F.C.C.2d 703, 22 F.C.C.2d 683, 22 F.C.C.2d 682, 20 F.C.C.2d 380, 19 F.C.C.2d 888, and 19 F.C.C.2d 620.

Needless to say, in view of the sheer size of this appendix, it is not unlikely that some cases have simply been overlooked during the course of research.

[Compendium of 259 Cases Omitted from Published Version of Order of Injunction]

### APPENDIX II

This appendix, prepared by the Clerk of the Court for the United States District Court for the District of Connecticut, collects all cases filed by Anthony R. Martin-Trigona presently pending before this court or on appeal from this court to the United States Court of Appeals for the Second Circuit.

In early 1983, Chief Judge T.F. Gilroy Daly transferred all pending matters filed by Martin-Trigona to the undersigned.

By orders of May 6, 1983 and May 12, 1983, this court created Misc.Civ. No. H 83–62 to collect all new matters filed by Anthony R. Martin-Trigona and to provide a single caption for orders issued by the court and affecting all cases previously filed by Anthony R. Martin-Trigona.

[Compendium of 53 Cases Omitted from Published Version of Order of Permanent Injunction]