**In re SANCTIONS FOR FAILURE TO COMPLY WITH A COURT ORDER.**

**In re Anthony R. MARTIN–TRIGONA.**

**Misc. Civ. Nos. H 85–14 (JAC), H 83–62 (JAC).**

United States District Court, D. Connecticut.

Feb. 19, 1985.

562

John C. King, Bourke G. Spellacy, Up-
dike, Kelly & Spellacy, Hartford, Conn., for
Updike, Kelly & Spellacy.

## RULING ON ORDER TO SHOW CAUSE REGARDING FAILURE TO COMPLY WITH A COURT ORDER

JOSÉ A. CABRANES, District Judge:

The question presented is whether a law firm shall be sanctioned for having knowingly refused for more than a year to comply with an acknowledgedly lawful order of the United States Bankruptcy Court, allegedly because of a belief that the order was in conflict with a subsequent state court order.[1]

### Introduction

This court on August 28, 1984, found that the refusal of the Connecticut Bank & Trust Company ("CBT") "to comply with [the] acknowledgedly lawful order [of April 21, 1983] of the United States Bankruptcy Court [to provide certain documents to the court-appointed trustee in bankruptcy] ...

constitute[d] a contempt of the lawful orders of a federal court of competent jurisdiction," Certified Official Transcript of Hearing of August 28, 1984 (filed Aug. 29, 1984) ("8/28/84 Tr.") at 46, granted the trustee's motion for an order of contempt, *see id.* at 46–49 (statement of court's grounds for granting trustee's motion for order of contempt),[2] and imposed a daily fine on the contemnor until it had complied in full with the discovery order. The order of August 28, 1984 was stayed for ten days "to permit CBT, which claim[ed] it [was] ready, willing and able to comply with the court's orders ... to comply in full, in which case no such penalty [would] be imposed." *Id.* at 46–47.

Also on August 28, 1984, the court granted the trustee's application for reasonable attorney's fees incurred in connection with the preparation and argument of his mo-

---

1. This is an edited version of a ruling entered February 19, 1985. The ruling has been updated to reflect the renumbering of the Rules of Civil Procedure (D.Conn.) as a result of revisions effective as of May 1, 1985.

2. The court ruled, *inter alia:*

The claim regarding the existence of an appeal and its ostensible significance is utterly without merit, as a reading of the transcript of today's hour-long hearing would demonstrate. There is no evidence that any appeal was ever taken from the July 1, 1983 order of the district court dismissing the appeal of Martin-Trigona, other than the bald assertion by Martin-Trigona to CBT's counsel in private correspondence.

In addition, assuming arguendo that such an appeal was taken, it is not disputed that no stay of the district court's order of July 1, 1984 was ever sought or obtained by anyone.

No application for a stay of the bankruptcy court's order or any other federal court order was ever filed by CBT's counsel.

No application for a protective order of any kind was ever filed.

No motion for vacatur of the order of April 21, 1983 or for any other relief was ever filed by CBT.

The claim that there was a conflicting order of the Connecticut Superior Court is also totally without merit. First of all, counsel for CBT has not provided this court with any evidence of the existence of any such order. Counsel for CBT acknowledged today in open court that they had never secured any record of that order from the Superior Court. In

addition, counsel for CBT could not identify any documents or categories of documents whose production in this action would constitute a violation of the alleged order of the Superior Court.

Finally, the alleged order of the Superior Court, as represented by CBT's own counsel, provided that material in the state action could be turned over to "a court of competent jurisdiction." *See* Memorandum in Opposition to Motion for Contempt Against Connecticut Bank and Trust Company (filed August 22, 1984) at 2 and Exhibit A thereto at 1. There is no dispute that both the United States Bankruptcy Court and the United States District Court are courts of competent jurisdiction for all purposes arguably relevant here.

Third, there is the argument that CBT had a right to "hesitate" and to not comply with an acknowledgedly lawful order of a court of the United States because of the threat of a private party to commence litigation against CBT. This argument by a major Connecticut financial institution and by one of the state's leading law firms defies reason and constitutes an affront to the dignity and the authority of the courts as well as to the intelligence of anyone confronted by the argument.

Fourth, and finally, there is the argument that CBT is something like a "stakeholder" holding documents sought by adverse parties. No authority has been brought to the court's attention to support any such proposition. There was a court order in effect and everyone concerned, most especially the party failing to comply with that order, knew it.
8/28/84 Tr. at 47–49.

tion for an order of contempt, based upon an undisputed affidavit of the trustee's counsel in support of his claim. *Id.* at 50–51. *See* Rule 37, Fed.R.Civ.P.; Bankruptcy Rules 9014, 7037; 4A *Moore's Federal Practice* ¶ 37.02[10.–1] at 37–47 to 37–50 (2d ed.1984).

Having disposed of the contempt question and having granted the trustee's application for reasonable attorney's fees, the court thereupon ordered CBT's counsel, the Hartford law firm of Updike, Kelly & Spellacy, P.C. ("Updike, Kelly"), and the member of the firm who had submitted the firm's papers on the trustee's motion for an order of contempt, to show cause why the court should not issue an order requiring that Updike, Kelly itself

> pay a fine to the Clerk of the Court in the amount of $2,000 for its failure to comply or to seek compliance by its client of a lawful discovery order of a federal court and for its apparently intentional obstruction of the effective and efficient administration of the court's business.

8/28/84 Tr. at 51. *See id.* at 47–49 (set forth in the margin at note 2) (court's rejection of a series of Updike, Kelly arguments to justify failure to obey federal court order of April 21, 1983). *See also* Order (filed Aug. 29, 1984) (reciting Order to Show Cause and scheduling hearing); Certified Official Transcript of Hearing of September 6, 1984 ("9/6/84 Tr.") (filed Sept. 17, 1984) at 3 (restating background of the order to show cause hearing).

A hearing on the court's order to show cause was held on September 6, 1984, and Updike, Kelly has submitted three memoranda in opposition to the imposition of sanctions.

*Factual Background*

On April 21, 1983, Judge Robert L. Krechevsky of the United States Bankruptcy Court for the District of Connecticut entered an order in Bankruptcy Case No. 205–5–81–00254 (Bridgeport seat of court), pursuant to which CBT was ordered to

> deliver forthwith to Richard Belford, the Trustee herein, or to his attorney, copies of all banking records that [CBT] has in its possession in connection with accounts maintained at [CBT] by the debtor.

The order was entered with the consent of Updike, Kelly, acting as CBT's counsel. *See* 9/6/84 Tr. at 42–43.

On April 22, 1983, the debtor[3] filed a notice of appeal to the District Court from Judge Krechevsky's order.[4] This appeal was docketed as Civ. No. H 83–376 (JAC). By order of May 6, 1983 in Misc.Civ.No. H 83–62 (JAC), the undersigned, before whom all cases in the District Court involving the debtor had been consolidated, directed that all matters then pending in the Bankruptcy Court involving the debtor be transferred from the Bankruptcy Court to this court. Therefore, as of May 6, 1983, this court had jurisdiction of the appeal of the Bankruptcy Court's order, Civ.No. H 83–376, as well as the matter underlying the appeal.[5]

On May 9, 1983, Updike, Kelly appeared in the Superior Court of the State of Connecticut on behalf of CBT in an action brought by CBT against a corporation alleged to have a significant relationship to the debtor in the bankruptcy case. *See* Transcript of Hearing of May 9, 1983 in *Connecticut Bank & Trust Company v. 658 Ridge Road, Inc., et al.*, No. 36468 (Superior Court, Middlesex Judicial District) ("State Tr."), *appended to* Memorandum In Opposition to An Order of Con-

---

**3.** There is a mass of litigation, largely pernicious, in this Circuit and elsewhere, associated with Anthony R. Martin-Trigona, the debtor in question. *See generally In re Martin-Trigona*, 737 F.2d 1254 (2d Cir.1984); *see also In re Martin-Trigona*, 573 F.Supp. 1245 (D.Conn. 1983); *In re Martin-Trigona*, 592 F.Supp. 1566 (D.Conn.1984).

**4.** The debtor's appeal bears case number 2–82–00530, the Bankruptcy Adversary Proceeding number given by the Hartford seat of court to the former Bridgeport Case No. 205–5–81–00254.

**5.** *See In re Martin-Trigona*, 573 F.Supp. 1245, 1249–1250, n. 9 (and accompanying text), 1259 (Appendix B) (D.Conn.1983).

tempt Against Updike, Kelly & Spellacy, P.C. (filed Aug. 31, 1984) ("Updike, Kelly Memorandum I"). At the May 9, 1983 hearing, all concerned—the Updike, Kelly attorney, the attorney for the defendant in the state suit and the state court judge presiding over the discovery disputes in that case—were fully aware of the related proceedings in the United States Bankruptcy Court and that court's discovery order of April 21, 1983. *See* State Tr. at 3, 7, 8, 9, 10, 20, 23.

Following a series of oral rulings from the bench by the state court judge directing, *inter alia,* that certain information be conveyed by the defendant to CBT, the defendant's counsel sought a protective order to preclude the release "to any other party" of the information to be conveyed by the defendant to CBT. *Id.* at 23. The attorney from Updike, Kelly thereupon reminded the state court judge that "we have been ordered by the [B]ankruptcy [C]ourt to turn over all records the bank has with respect to this defendant." *Id.* at 23–24. There then ensued the following colloquy:

> [ATTORNEY:] ... If you are telling me I should not obey the [B]ankruptcy [C]ourt—

> THE COURT: The information supplied to you pursuant to the order shall not be voluntarily turned over to any individual person or corporation, excluding any court of competent jurisdiction which has jurisdiction over any matter between these parties.

> [ATTORNEY:] So if the court orders me to turn it over to them I can turn it over to the bankruptcy court?

> THE COURT: Yes.

*Id.* at 24.[6]

In a letter of June 16, 1983 addressed to this court ("Shortell Letter"), Updike, Kelly partner Thomas J. Shortell contended that an "apparent or potential conflict" existed between Judge Krechevsky's April 21, 1983 order and a protective order issued by the Connecticut Superior Court. Shortell Letter at 1.[7] According to Mr. Shortell, the state court's order, issued "in a foreclosure action" involving the person "whose individual bankruptcy is now pending before Your Honor," provided "that no materials obtained pursuant to the *discovery process* in [the state] case could be turned over to any one *other than a court of competent jurisdiction." Id.* (emphasis supplied). Mr. Shortell wrote, "Should Your Honor have any orders or suggestions regarding

---

**6.** It is clear that both the attorney from Updike, Kelly who appeared in the Superior Court action on behalf of CBT, and the presiding Superior Court judge, fully expected that that court's many decisions on discovery issues, following detailed colloquy with counsel on the record, would require an examination by counsel of the transcript of the hearing of May 9, 1983. State Tr. at 21. As it happens, Updike, Kelly did not obtain a transcript of the proceedings in the Connecticut Superior Court or the order of that court until after this court had held CBT in contempt and had issued its order to show cause.

**7.** The text of the Shortell Letter was as follows:

> This office represents Connecticut Bank & Trust Company, which has in the past extended credit to one Anthony R. Martin-Trigona, whose individual bankruptcy is now pending before Your Honor and was scheduled for a status conference on June 6, 1983. Our office currently is representing the bank in a foreclosure action brought pursuant to a mortgage on property owned by 658 Ridge Road, Inc., whose officers purportedly include An-

thony R. Martin-Trigona and his mother, Helen Martin-Trigona. In the context of the pending bankruptcy matter, Attorney Richard Coan, who represents the Trustee, moved for an order directing Connecticut Bank & Trust to turn over any records that the bank holds with respect to credit extended to Mr. Martin-Trigona individually. *Simultaneously, in the context of the foreclosure action, counsel for the defendant corporation obtained a ruling in Connecticut Superior Court that no materials obtained pursuant to the discovery process in that case could be turned over to anyone other than a court of competent jurisdiction.* Due to the apparent or potential conflict between the orders of the Bankruptcy Court and Superior Court and given Your Honor's Stay of Proceedings in the bankruptcy until after June 6, 1983, *the documents requested by the Trustee in bankruptcy* have not been turned over to the Trustee's attorney. Should Your Honor have any orders or suggestions regarding the foregoing, we look forward to receipt of same. If you should have any questions, please do not hesitate to contact the undersigned.
> (emphasis supplied).

the foregoing, we look forward to receipt of same." *Id.* at 2.

This court ordered the Shortell Letter docketed on June 23, 1983, and dismissed Civ. No. H 83–376 (JAC) on July 1, 1983. It thereby left undisturbed the April 21, 1983 order of the Bankruptcy Court and effectively adopted it. *See* note 5, *supra,* and accompanying text. It is acknowledged that Updike, Kelly was aware of the debtor's appeal to the District Court and its dismissal by this court.[8] *See* Memorandum in Opposition to Motion for Order of Contempt Against Connecticut Bank and Trust Company (filed August 22, 1984) ("CBT Contempt Memorandum") at 1–2.

The caption of the Shortell Letter merely referred to the name of the debtor; there was no indication as to which of scores of federal proceedings concerned Mr. Shortell. The Shortell Letter also failed adequately to identify the state proceeding or the nature of the supposed conflict between the federal court's order and that of the state court. Indeed, the "apparent or potential conflict" between the federal court order and the state court order has never been explained by Updike, Kelly.

As it happens, the transcript of the May 9, 1983 hearing in the Superior Court makes clear (as does the Shortell Letter itself) that the state court protective order, on its face, only applied to documents obtained by CBT from the defendant (the debtor in the bankruptcy proceeding) pursuant to discovery in the state action. Accordingly, the state court order regarding documents conveyed *to CBT* by its adversary in the state action did not purport—and could not have purported—to cover any material in CBT's possession that it might have obtained from other sources, much less the records maintained by CBT itself.

In any event, at no time did Updike, Kelly file in this court a motion for a protective order or any other appropriate application, pursuant to the Federal Rules of Civil Procedure, with respect to problems it might have had in complying with the Bankruptcy Court's order of April 21, 1983.

In the summer of 1984, more than a year after the entry of Judge Krechevsky's order, counsel for the trustee in the bankruptcy proceeding contacted Updike, Kelly's Mr. Shortell to ask why the documents discoverable from CBT had not been produced. In the period between this court's July 1, 1983 order and the summer of 1984, counsel for the trustee had been engaged in protracted and complex litigation involving the same debtor—litigation with which neither CBT nor Updike, Kelly had been burdened in any respect.

Again asserting the purported "conflict" between the Bankruptcy Court's April 21, 1983 order and the state court's order of May 9, 1983, Mr. Shortell informed the trustee's counsel that the documents that were the subject of the federal court order would not be conveyed to the trustee unless *another* federal court order was secured. *See* 8/28/84 Tr. at 4–5, 6; 9/6/84 Tr. at 16, 23, 28–29; Trustee's Motion for Order of Contempt Against Connecticut Bank and Trust Company (filed Aug. 1, 1984). Apparently, one federal court order, an appeal from which had been dismissed

---

**8.** In its Memorandum in Opposition to An Order of Contempt Against Updike, Kelly & Spellacy, P.C. (filed Aug. 31, 1984) ("Updike, Kelly Memorandum I") at 2, n. *, Updike, Kelly claimed that the debtor in the bankruptcy proceeding filed an appeal of this court's July 1, 1983, ruling with the Court of Appeals on July 25, 1983. The court has not been referred to a copy of a properly filed Notice of Appeal applicable to this matter. Nor is it aware of anything in the record of this case suggesting that any appeal to the United States Court of Appeals for the Second Circuit was taken from this court's dismissal of the appeal from the Bankruptcy Court's order, although Updike, Kelly has contended that *the debtor claimed* that he had taken such an appeal. Memorandum In Opposition to Motion for Order of Contempt Against Connecticut Bank and Trust Company (filed Aug. 22, 1984) at 2; 8/28/84 Tr. at 18–22. In any event, Updike, Kelly concedes that no stay was ever entered by this court or the Court of Appeals concerning the debtor's purported appeal of this court's July 1, 1983, ruling and that the purported appeal was not a proper ground for not complying with the Bankruptcy Court's order. *Id.* at 21–22.

by another federal court, was not enough. Indeed, Mr. Shortell suggested to the trustee's counsel that the trustee secure an additional federal court order by filing in this court a motion to hold CBT (Mr. Shortell's own client) in contempt. *Id.*

On August 1, 1984, the trustee moved to hold CBT in contempt. By endorsement order of August 16, 1984, this court scheduled a hearing on the trustee's motion for August 28, 1984, a day when other matters concerning this debtor's affairs were to be considered.

Updike, Kelly, on behalf of CBT, opposed the motion for contempt for four reasons: (1) the debtor had appealed this court's July 1, 1983 order of dismissal to the Court of Appeals; (2) the purported "conflict" between the federal court's order of April 21, 1983, and the state court's order of May 9, 1983; (3) CBT's fear of the debtor in these proceedings, who apparently was a principal of the corporate defendant in the state lawsuit and who "on numerous occasions ha[d] threatened suit against CBT if said bank records [were] released"; and (4) CBT merely had been acting "in a position ... similar to that of a stakeholder." [9] *See* CBT Contempt Memorandum.

In finding CBT in contempt and awarding attorney's fees against CBT, the court rejected all of CBT's arguments as meritless. 8/28/84 Tr. at 46–51. *See* note 2, *supra.*

## Discussion
### I.

Updike, Kelly argues that sanctions may not be imposed unless the court finds that Updike, Kelly has acted in bad faith and that such a finding is inappropriate in the circumstances of this case. Second Supplemental Memorandum of Law in Opposition

to Sanctions Against Updike, Kelly & Spellacy, P.C. ("Updike, Kelly Memorandum III") (filed Sept. 21, 1984).

The Supreme Court has held that "a specific finding as to whether counsel's conduct in this case constituted *or was tantamount to bad faith* ... would have to precede any sanction *under the court's inherent powers." Roadway Express v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2465, 65 L.Ed.2d 488 (1980) (emphasis supplied). The court's inherent authority to impose sanctions for disobedience of its orders is supplemented and reinforced in this instance by Rule 31 of the Rules of Civil Procedure (D.Conn.), which provides:

> It shall be the duty of counsel to promote the efficient disposition of cases. The Court may assess reasonable costs directly against counsel who has disobeyed an order of the Court or who has intentionally obstructed the effective and efficient administration of the Court's business.

Updike, Kelly argues that the authority to promulgate Local Rules is derived from the courts' inherent powers, and thus the *Roadway Express* standard of bad faith applies to sanctions under Rule 31. Updike, Kelly Memorandum III at 2–7.

 Updike, Kelly's position is incorrect for two reasons. First, the authority to promulgate Local Rules is grounded upon the statutory rule-making power conferred by 28 U.S.C. § 2071 and Rule 83, Fed.R.Civ.P. (enacted pursuant to 28 U.S.C. § 2072) as well as the inherent power of the court. *In re Sutter*, 543 F.2d 1030, 1036–1037 (2d Cir.1976) (upholding validity of Local Rule 8, R.Civ.P. [E.D.N.Y.], upon which this District's Local Rule 31 is modeled).[10] *Id.* The inherent authority of the

---

**9.** In its response to the order to show cause of August 28, 1984, and its opposition to sanctions, CBT has relied only on the second and third arguments. *See* Updike, Kelly Memorandum I. *See* note 8, *supra,* and accompanying text.

**10.** Anything arguably to the contrary in *J.M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338, 357 (D.Conn.1981) is not relevant to this issue, because at the time *J.M. Cleminshaw Co.*

was decided, Local Rule 31 did not exist. In any case, in *J.M. Cleminshaw Co.,* this court noted that in *In re Sutter,* the Court of Appeals had found "the district court's rule-making authority to be grounded, *at least in part,* in the 'inherent power of a court to manage its own affairs.'" *J.M. Cleminshaw Co., supra,* 93 F.R.D. at 357, *quoting In re Sutter, supra,* 543 F.2d at 1037 (emphasis supplied).

court is the residual power to act in the absence of rules grounded in statute. Some finding that counsel's conduct constituted or was tantamount to bad faith may be necessary where a court is acting solely pursuant to its inherent authority but not where, as in this case, the court also acts under a validly adopted rule of court.

Second, well after *Roadway Express*, our Court of Appeals affirmed the imposition of sanctions under rules enacted pursuant to federal statutory authority, as opposed to a court's inherent authority, in the absence of a finding of bad faith. *See e.g. Penthouse International Ltd. v. Playboy Enterprises*, 663 F.2d 371, 386–387 (2d Cir. 1981) (sanction of attorney fees could be imposed under Rule 37, Fed.R.Civ.P., for "grossly negligent failure to obey a discovery order," "negligence," "fault," and "gross professional incompetence no less than deliberate tactical intransigence"); *Unicure, Inc. v. Thurman*, 97 F.R.D. 7, 10–11 (W.D.N.Y.1982) ("A party's bad faith *or gross negligence* in failing to comply with a court order to provide discovery may justify imposing even the harshest of sanctions under rule 37 and/or rule 41—dismissal of the action or entry of a default judgment").[11] *See also Cine Forty-Second St. Theatre v. Allied Artists*, 602 F.2d 1062, 1066–1067 (2d Cir.1979) (same [pre-*Roadway Express*], involving "harshest" sanction—effective dismissal by precluding introduction of evidence as to damages); *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 827–828 (2d Cir. 1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (Court of Appeals implies that district court's finding of bad faith is unnecessary for attorney's fee sanctions imposed pursuant to Rule 37 rather than pursuant to the court's inherent powers).

Our Court of Appeals in *In re Sutter, supra*, 543 F.2d at 1035, while noting that attorneys should not be disciplined for "mistake, inadvertence or error of judgment," held that courts may "require[ ] of attorneys at least a reasonable degree of attentiveness to their responsibilities to the court." Indeed, in that case, the attorneys were not found to have acted in bad faith but were nonetheless required to pay sanctions (in the form of a fine payable to the court in the amount of costs) for recklessness. *Id.*

■ In sum, a finding of bad faith is not necessary for the imposition of sanctions pursuant to Local Rule 31 "against counsel who [have] disobeyed an order of the Court or who [have] intentionally obstructed the effective and efficient administration of the Court's business."

## II.

In this case, Updike, Kelly offers two explanations for its failure to obey the order of the Bankruptcy Court: the alleged existence of a state court order in "apparent or potential conflict" with that of the Bankruptcy Court (the subject of the Shortell Letter) and the debtor's threats to sue CBT if it complied with the order of the Bankruptcy Court.[12]

## A.

For a number of reasons, Updike, Kelly cannot justify its decision to have CBT disobey the Bankruptcy Court order by re-

---

**11.** The fact that the rules in the cases cited in the text are rules of civil procedure enacted pursuant to 28 U.S.C. § 2072, while the rule in this case is a court rule enacted pursuant to 28 U.S.C. § 2071, *In re Sutter, supra*, 543 F.2d at 1036–1037, is of no consequence, because the rules at issue in the cited cases and in this case are all based on statutes rather than on the inherent power of the courts; the bad faith (or "tantamount to bad faith") standard of *Roadway Express* was limited to sanctions imposed pursuant to a court's inherent powers. In any event, local court rules also are enacted pursuant to

Rule 83, Fed.R.Civ.P., *In re Sutter, supra*, 543 F.2d at 1036–1037, and therefore they are akin to the rules of civil procedure cited in the text.

**12.** The second explanation was not relied upon by Updike, Kelly as an independent justification for the failure to comply with the federal court order. Counsel for Updike, Kelly stated, at the September 6, 1984 hearing: "Had there been no state court orders ... I don't think this problem would have arisen...." 9/6/84 Tr. at 43.

lying on the state court order or the Shortell Letter.

■ First, Updike, Kelly failed properly to bring the issue of the state court's ruling to this court's attention. No motion for a protective order or a stay of the Bankruptcy Court's order or any other proper application was ever filed in the Bankruptcy Court or in this court. The Shortell Letter did not even specifically identify the state proceeding or the order that assertedly conflicted with that of the Bankruptcy Court. Updike, Kelly did not obtain a copy of the transcript of the state court proceedings that included the state judge's order until after this court had entered its order to show cause (more than a year after entry of the state court order).[13]

In any event, the Shortell Letter did not describe with any specificity the documents embraced by the state court's order or the nature of the "apparent or potential conflict" between the state court order and the federal court order (indeed, the conflict has never been identified).

It is also significant that the Shortell Letter sought no relief from the court. The letter merely suggested (ambiguously, at best) that some sort of problem might exist, and indicated that Updike, Kelly "look[ed] forward" to receiving "any orders or suggestions" the court might have concerning the matters thus brought to the court's attention.

■ Second, the transcript of the state proceedings reveals that the Bankruptcy Court's discovery order of April 21, 1983 had been brought to the attention of the state court on May 9, 1983 by a Updike, Kelly attorney and that the state court envisaged compliance by CBT with the pre-existing federal court order. State Tr. at 23–24; *see id.* at 3, 7, 8, 9, 10, 20. In sum, there was never any "apparent or poten-tial" conflict between the state court order and federal court order, much less an actual conflict.

■ Third, even if an arguable conflict had existed, the protective order of the state court could only have covered—and, indeed, only purported to cover—documents disclosed *to CBT by the defendant* in the state action. Indeed, the Shortell Letter acknowledges as much.[14] The Bankruptcy Court's discovery order covered "banking records that [CBT had] in its possession in connection with accounts maintained at [CBT] by the debtor." Therefore, it is clear that most, if not all, of the material covered by the Bankruptcy Court's order was already in CBT's possession before the May 9, 1983, hearing in the state court and was not derived from discovery sought by CBT from the defendant in the state action.[15] As it happens, CBT did not convey to the trustee *any* of the material covered by the Bankruptcy Court's order until after the bank had been held in contempt of court on August 28, 1984.

It may be argued that, in these circumstances, the state court order would have permitted Updike, Kelly to turn over the documents that were the subject of the state court proceeding only *to* "a court of competent jurisdiction" (*e.g.,* the Bankruptcy Court or the District Court) but not to obey the preexisting, acknowledgely lawful order *of* "a court of competent jurisdiction" to turn such documents over to a third party. Any such argument would strain credulity for a number of reasons. Aside from the question of whether a state court would be empowered in these circumstances to modify a federal court order or to modify a party's obligations thereunder, it is clear from the context of the colloquy in the state court that the state court judge intended to avoid interfering with the oper-

13. *See* note 6, *supra.*

14. *See,* note 7, *supra.*

15. The following curious colloquy took place at the order to show cause hearing in this court:

THE COURT: Is the information covered by [Superior Court] Judge Vasington's order the same matter that was covered by [Bankruptcy] Judge Krechevsky's order?
MR. KING: There is the possibility that it could be, your Honor.
9/6/84 Tr. at 11.

ations of the Bankruptcy Court, of whose order he had been apprised by Updike, Kelly. Moreover, Updike, Kelly has failed to comply with even a painfully literal construction of the state court's order. The law firm has made no effort at any time to convey to either federal court (as opposed to the trustee, under the federal court order of April 21, 1983) *any* of the documents in question—for example, the CBT documents that were the subject of the federal order and that were never at issue in the state court.

Fourth, on July 1, 1983, after the state court proceeding and the submission of the Shortell Letter, the debtor's appeal of the Bankruptcy Court's discovery order was dismissed. That action put the District Court's imprimatur on the incontestably valid order of the Bankruptcy Court. While not necessary to the enforceability of the Bankruptcy Court's order, this court's action should have left no doubt in anyone's mind that CBT was under an obligation to turn over the relevant material to the trustee. In any event, by an order of May 6, 1983, the District Court had assumed jurisdiction of all matters then pending in the Bankruptcy Court involving this debtor, thereby converting Bankruptcy Proceeding No. 2–82–00530 into a District Court case; after May 6, 1983, the Bankruptcy Court order of April 21, 1983 was, in effect, an order of the District Court, until and unless modified or vacated by the District Court or by a higher court. *See* note 5, *supra,* and accompanying text. *Cf.* 28 U.S.C. § 1450 (upon removal to federal court, prior orders of state court remain in full effect until modified or vacated); Bankruptcy Rule 9027 (bankruptcy analogue to Section 1450).

■ Updike, Kelly places much emphasis on its asserted reliance on the court's endorsement on the Shortell Letter of an instruction to the Clerk that it be "docketed." That Updike, Kelly could reasonably have believed that such an endorsement on such a letter, without more, justified its disobeying a court order, and continuing to do so for more than a year, merits little

discussion. But even if Updike, Kelly reasonably believed that the "docketing" of the Shortell Letter had some particular legal significance—one that would justify disobedience of an order of the Bankruptcy Court or the District Court—any such belief would have been fully undermined by the District Court's order of July 1, 1983, well *after* the endorsement order to the Clerk to "docket" the Shortell Letter, whereby the appeal of the Bankruptcy Court's order was dismissed. Updike, Kelly was aware of the appeal of the Bankruptcy Court's order and of its dismissal by this court. CBT Contempt Memorandum at 1–2.

■ Updike, Kelly also attempts to explain its failure to comply with the Bankruptcy Court's order by invoking its supposed concerns about the jurisdiction or position of the Bankruptcy Court in the aftermath of the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). This argument is without merit. First, Updike, Kelly raised this issue for the first time on August 31, 1984, *see* Updike, Kelly Memorandum I at 3, well after the court issued its order to show cause. Nothing in the Shortell Letter even remotely suggests that the status of the Bankruptcy Court or the *Northern Pipeline* jurisprudence was of any concern to Updike, Kelly at any relevant time. Second, this court's order of July 1, 1983 dismissed the appeal of the Bankruptcy Court's order and thereby left that order intact. Third, by that date the District Court had assumed jurisdiction of this case; consequently, all unmodified Bankruptcy Court rulings and orders had effectively become orders of the District Court. The jurisdiction of the Bankruptcy Court thus was of no particular relevance to this matter.

### B.

■ Updike, Kelly has alleged that it feared retaliation by the debtor if CBT were to comply with the federal court or-

ders. This argument requires only brief discussion.

Threats from an adversary to sue if one complies with a federal court order cannot possibly justify intentional violation of the order. This simple proposition is merely a restatement of the rule of law. It is all the more obvious where the party making the threats is a pathological *pro se* litigant notorious for his efforts to impede the administration of justice and the party receiving the threats is the state's largest bank (represented by one of its leading law firms).

### C.

■ A motion for contempt is always a matter of grave concern, because it raises questions regarding the court's own authority. *See generally In re Weiss*, 703 F.2d 653, 660–662 (2d Cir.1983). It is not a matter to be trivialized, as Updike, Kelly has done, *see* 9/6/84 Tr. 25–26, by suggesting that it is a sound way in which to resolve its doubts (however unfounded and misguided) about earlier court orders resolving discovery disputes. When the trustee insisted that Updike, Kelly comply with an acknowledgedly lawful federal court order—an order that had not been modified and had not been disturbed by any higher federal court—Updike, Kelly's response was not, for example, to move for a protective order, but rather to invite the trustee to file a motion to hold Updike, Kelly's client in contempt. This curious maneuver was in itself a wilful abuse of the legal process that constitutes an "intentional[ ] obstruct[ion of] the effective and efficient administration of the Court's business," Local Rule 31, and compounded Updike, Kelly's disobedience of the federal court order.

■ Updike, Kelly's claim that it always "wanted" to turn over the documents to the trustee, *see* 9/6/84 Tr. at 23, is not compelling in these circumstances. For

more than a year, Updike, Kelly and CBT failed to comply with a valid federal court order—or, indeed, to disclose any documents at any time to the trustee—or to move to modify the order.[16] These lapses constitute, at the least, gross negligence and a reckless indifference to a federal court order, regardless of any arguable subjective intent. *See generally National Lawyers Guild v. Attorney General*, 94 F.R.D. 600, 614–615 (S.D.N.Y.1982) (on significance of court orders).

### III.

■ Even assuming *arguendo* that a finding of conduct in bad faith, or tantamount to bad faith, is required in order to impose sanctions under Rule 31, the court finds that sanctions under Rule 31 (and the court's inherent powers) would be appropriate in this case. The egregious conduct described above is certainly tantamount to bad faith. *See generally Litton Systems, Inc., supra*, 700 F.2d at 827–828 (intermeshed discussion of gross negligence, wilful misconduct and bad faith); *International Mining Co., Inc. v. Allen & Co., Inc.*, 567 F.Supp. 777, 788–790 (S.D.N.Y. 1983) (dismissal for failure to comply with discovery order where court equated gross negligence with wilfulness but made no specific finding of bad faith).

■ Updike, Kelly's argument that its intent (namely, its purportedly constant willingness to comply with the Bankruptcy Court's order) constitutes good faith, *see* 9/6/84 Tr. at 22–23; Supplemental Memorandum of Law in Opposition to Sanctions Against Updike, Kelly & Spellacy, P.C. ("Updike, Kelly Memorandum II") (filed Sept. 5, 1984), is unpersuasive. A knowing violation of court orders may not be excused on the basis that the violator acted without malicious intent or "sinister motive." Updike, Kelly Memorandum III at 2, 6, 11.[17] Indeed, a knowing and deliber-

---

16. This unjustified failure to turn over any documents, standing alone, would warrant a finding of bad faith.

17. In this regard, Updike, Kelly's protestation, Updike, Kelly Memorandum II at 3, *citing In re Williams*, 509 F.2d 949, 960 (2d Cir.1975), that it did not mean "to obstruct, disrupt or interfere

ate failure by attorneys to comply with a court order raises a strong presumption of bad faith.

### Conclusion

■ For the reasons stated above, the court finds that it is appropriate under applicable law that Updike, Kelly pay costs to the Clerk of the Court in the amount of $2,000, for its failure to comply, or to seek compliance by its client, with a lawful order of a federal court and for the resulting obstruction of the effective and efficient administration of the court's business.

This sum is reasonable in view of the sanctions imposed by federal judges in Connecticut for comparable offenses.[18] These sanctions are nonetheless ordered with considerable reluctance. It is never easy for a court to impose sanctions on members of the Bar. Nevertheless, sanctions are appropriate in these circumstances, and will deter similar misconduct in the future by Updike, Kelly and others. *See generally Roadway Express v. Piper, supra,* 447 U.S. at 763–765, 100 S.Ct. at 2462–2463 (importance of sanctions for the purpose of general deterrence); *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (same); *Litton Systems, Inc. v. American Tel. & Tel. Co., supra,* 700 F.2d at 827 (same); *Penthouse International Ltd. v. Playboy Enterprises, supra,* 663 F.2d at 386–387 (same); *Cine Forty-Second St. Theatre v. Allied Artists, supra,* 602 F.2d at 1066–1067 (same).

with the administration of justice" is unpersuasive. The quoted language is taken out of context; the sentence in question begins: "To warrant a conviction in criminal contempt..." The proceedings herein do not involve allegations or suggestions of criminal misconduct of any kind.

18. *See generally* Endorsement Ruling on Motion for Sanctions, *Henderson v. Soucie,* Civ. No. N 83–426 (D.Conn. Jan. 17, 1985) (Daly, C.J.) (fine of $1000 plus court costs of $300 payable to court and costs and fees payable to moving party imposed on defendant's law firm pursuant to Rule 37, Fed.R.Civ.P.); Endorsement Ruling on Motion of Court to Enter Default Against C.E. Maguire, Inc., *Ash v. Board of Public Utilities Commissioners,* Civ. No. H 84–373 (D.Conn.

Accordingly, Updike, Kelly shall pay $2,000 to the Clerk of the Court, without recourse to its client, by no later than February 26, 1985, and shall certify compliance with the terms of this order by no later than February 27, 1985.

It is so ordered.

Dec. 26, 1984) (Clarie, J.) (sanction of $500 payable to opposing party pursuant to Rule 37 for dilatory conduct of Thomas Shortell imposed on his client); Ruling on Motions for Sanctions, *Crawford v. Providence & Worcester Railroad,* Civ. No. H 81–719 (D.Conn. Jan. 8, 1985) (Blumenfeld, J.) (sanction of $1,071.92 for costs and fees payable to opposing party for misconduct of Thomas Shortell imposed on his client); Ruling on Pending Motions, *Auwood v. Harry Brandt Booking Office, Inc.,* Civ. No. N 79–144 (D.Conn. May 3, 1984) (Dorsey, J.) (sanction of $2,500 for costs and fees payable to opposing party imposed on defendant for abuse of discovery process).